

# In the Missouri Court of Appeals
# Eastern District

## DIVISION TWO

| | | |
|---|---|---|
| TIM W. BOWOLAK, | ) | No. ED100502 |
| | ) | |
| Respondent/Cross-Appellant, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| vs. | ) | 11SL-CC02238 |
| | ) | |
| MERCY EAST COMMUNITIES d/b/a | ) | Honorable Thea Anne Sherry |
| MERCY HOSPITAL ST. LOUIS f/k/a | ) | |
| ST. JOHN'S MERCY HEALTH SYSTEM | ) | |
| d/b/a ST. JOHN'S MERCY MEDICAL | ) | |
| CENTER, | ) | |
| | ) | |
| Appellant. | ) | FILED:  October 28, 2014 |

### OPINION

Mercy East Communities d/b/a Mercy Hospital St. Louis f/k/a St. John's Mercy Health

System d/b/a St. John's Mercy Medical Center (Mercy) appeals from the judgment entered

following a jury verdict in favor of Tim W. Bowolak (Bowolak) in the amount of $50,000.00

compensatory damages, $500,001.00 punitive damages, attorneys' fees in the amount of

$81,500.00 and court costs.  Bowolak cross appeals the portion of the judgment assessing post-

judgment interest at the rate of 5 percent, as opposed to 9 percent, regarding the award of

compensatory and punitive damages.  We affirm.

### Factual and Procedural Background

In October 2004, Bowolak applied for the position of Supply Technician at Mercy.  This

was a manual labor job that involved transporting supplies and equipment to nurses.  Bowolak's

previous work experience was all in manual labor jobs.[1]

When Bowolak initially applied for employment with Mercy in October 2004, he was required to undergo a physical examination which was performed on October 13, 2004 by Mercy through one of its registered nurses. As part of his physical examination on October 13, 2004, Bowolak was asked about his prior medical history. He indicated that he had suffered a work-related injury in October 2002, which resulted in a spinal fusion in May 2003. Bowolak also indicated that he was presently taking pain medications, Hydrocodone and Methocarbamol. Bowolak passed the physical examination, and he was accepted into the job with "no restrictions."

Bowolak worked as a Supply Technician from October 2004 until February 2008. During that time, he never missed work because of any physical problem, consistently received good job assessments, and never was told that he could not perform the essential functions of his job.

In February 2008, Bowolak was asked about transferring to the linen department as a Care Service Associate. The job involved providing linen and supplies to the nurses. Bowolak accepted the position and worked without incident from February 2008 to January 7, 2010. Bowolak testified that he suffered a minor shoulder injury sometime in 2009; however, he did not miss work as a result of that injury. Bowolak received good assessments as a Care Service Associate and was able to perform his job.

On January 7, 2010, Bowolak was at work pulling a cart of linen that weighed approximately 500 lbs. Bowolak noticed that one of the wheels on the cart was not functioning properly and he was having a difficult time moving the cart. He testified that as a result, while moving the cart, he "tweaked something" in his lower back. Although Bowolak finished his day of work, he informed his supervisor of the incident and was sent to Mercy's

---

[1] The record shows that at the time of trial, Bowolak was 41 years old, that he had not completed high school, but did obtain a GED. He had little if any formal education beyond the GED.

2

doctors for treatment. Bowolak was treated primarily by Dr. Sharon Godar, who placed Bowolak on light duty, and on March 23, 2010, released him back to "regular duty," without restrictions. Bowolak did not feel he was yet ready to return to work on March 23, 2010, but returned to full duty, without restrictions, in early May 2010. Between March 2010 and May 2010, Mercy refused worker's compensation benefits to Bowolak. As a result, he filed a worker's compensation claim, the only worker's compensation claim he filed while employed with Mercy.

Bowolak continued to work as a Care Service Associate, without restrictions and without missing work due to physical problems, from May 2010 until March 3, 2011. He continued to receive good assessments from Mercy. Notably, Mary Obermann (Obermann), Bowolak's direct supervisor, testified by deposition that he was a good worker and that he successfully performed his duties as a Care Service Associate. Michael Wyatt (Wyatt), who was Obermann's supervisor, also confirmed through his deposition testimony that Bowolak was able to perform the essential functions of his job as a Care Service Associate.

On March 3, 2011, Bowolak was called to a meeting by Mercy. Present at the meeting were Obermann, Wyatt, Ruth Brooks (Brooks), Mercy's Workers' Compensation Coordinator, and Lois Dodson (Dodson), Mercy's Human Resource Manager. At this meeting, Bowolak testified he was presented with an unsigned document marked "DRAFT,"[2] that was dated December 10, 2003 and allegedly from the office of Dr. Allan Gocio, the physician who treated Bowolak and performed his back surgery as a result of a work-related injury that occurred in October 2002 while employed at Cardinal Scale Manufacturing, Inc. (Cardinal Scale).[3] The "DRAFT" document indicated "at the current time" Bowolak was limited to "lifting to 30

---

[2] This document was discovered by Wanda Clark, one of Mercy's workers' compensation specialists, in connection with her investigation of Bowolak's worker's compensation claim relating to the January 7, 2010 incident.

[3] Bowolak filed a worker's compensation claim regarding this injury which resulted in a 32% permanent partial disability rating and a settlement payment with Cardinal Scale of $54,720.00.

pounds on a repetitive basis and no greater than 50 pounds on an occasional basis." Frequent breaks were suggested but he was found to be "suitable for work on an immediate basis." Bowolak testified that he had never seen the document before this meeting but was informed that he could no longer continue in his job as a Care Service Associate because of the alleged restrictions contained in the document. Bowolak was told that he would be contacted after further investigation. Bowolak never worked for Mercy again and was never paid by Mercy.

At the meeting, Bowolak explained that Dr. Gocio never discussed the contents of the "DRAFT" document with him, he had never before seen the document, and that he was able to perform his job and that he had no physical restrictions. The unsigned document was not directed to Bowolak, and there was never any evidence presented at trial that Bowolak ever received this unsigned document. At trial, Bowolak reiterated that no doctor had ever recommended any permanent restrictions to him, and that he had never seen the unsigned document at any time before March 2011. Bowolak testified that although his previous back injury was serious and that his back was never normal after the injury, he was capable of performing his job at Mercy. In addition, Dr. Godar was aware of Bowolak's prior back injury from 2002, was aware of the physical requirements of Bowolak's job and was in possession of the unsigned "DRAFT" document dated December 10, 2003, when Dr. Godar released Bowolak back to full duty, without restrictions, on March 23, 2010.

On March 9, 2011, Bowolak was called in for a second meeting with Mercy and again the unsigned "DRAFT" document was discussed. Bowolak reiterated that he had no restrictions and that he could perform his job. Again, Bowolak was informed that he could no longer work in his job as a Care Service Associate; he was also was informed that he would not be paid. Neither at the March 3, 2011, meeting nor at the March 9, 2011, meeting was Bowolak offered a

4

different position by Mercy. Moreover, he was never offered an opportunity to undergo a physical examination and was never told that he had any ability to be reinstated to his job. Instead, Bowolak was informed that he could go on the internet and if he found something, he could apply for a job at Mercy by contacting a person named Laura Austin. While he did go on the internet as instructed, he found no jobs that would meet the alleged restrictions.

On March 9, 2011, Bowolak was given a letter by Mercy that indicated that he was terminated. The letter stated that Bowolak could no longer work in his position as a Care Service Associate because "you are not able to perform the essential functions of your role." Bowolak's termination was based on the unsigned "DRAFT" document date December 10, 2003, purportedly from Dr. Gocio's office.

On April 7, 2011, pursuant to the Missouri Human Rights Act (MHRA), Bowolak appeared at the Equal Employment Opportunity Commission (EEOC) and filed both his Charge of Discrimination against Mercy with the EEOC and with the Missouri Commission on Human Rights (MCHR). After Bowolak filed his claim, a representative of the EEOC contacted Dodson and requested that Mercy reinstate Bowolak; Dodson responded that Mercy would not reinstate Bowolak. On April 14, 2011, Dodson wrote a letter to Bowolak, and "cc'd" to Wyatt, confirming that Bowolak was no longer employed by Mercy.

On October 11, 2011, Bowolak brought this action for disability discrimination pursuant to the MHRA. On May 2, 2013, following a jury trial, judgment was entered for Bowolak. The jury awarded Bowolak compensatory damages in the amount of $50,000.00 and punitive damages in the amount of $500,001.00. The trial court entered judgment in accordance with the jury's verdict.

On May 7, 2013, Bowolak filed a Motion to Amend Judgment to Include an Award of

5

Attorneys' Fees. On June 3, 2013, Mercy filed its Combined Motions for Directed Verdict, Judgment Notwithstanding the Verdict, Remittitur, Amendment of Judgment and/or a New Trial. On July 8, 2013, prior to ruling on Mercy's combined post-trial motions, the trial court amended the original Judgment by including attorneys' fees in the amount of $81,500.00. On September 16, 2013, the trial court denied Mercy's post-trial motions and entered Judgment in favor of Bowolak in the amount of $550,001.00, with post-judgment interest at the rate of 5 percent, and entered judgment for attorneys' fees in the amount of $81,500.00, with post-judgment interest at the rate of 9 percent.

On September 25, 2013, Mercy filed its notice of appeal alleging that the trial court erred in denying Mercy's post-trial motions. Bowolak cross-appealed alleging that the trial court erred in ordering post-judgment interest at a rate of 5 percent, as opposed to 9 percent, as to the award of $550,001.00. This appeal follows.

### Standard of Review

In reviewing a denial of a motion for judgment notwithstanding the verdict, we review the record to determine whether the plaintiff made a submissible case. Williams v. Trans States Airlines, Inc., 281 S.W.3d 854, 865 (Mo. App. E.D. 2009). To make a submissible case, a plaintiff must demonstrate that each and every fact essential to liability is predicated upon legal and substantial evidence. Williams, 281 S.W.3d at 865-66. "Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of fact can reasonably decide the case." Id. at 866. In determining whether the evidence was sufficient to support the jury's verdict, we review the evidence in the light most favorable to the result reached by the jury, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with the verdict. Id. A jury verdict will not be overturned unless there is

a complete absence of probative facts to support the jury's verdict. Id. Where reasonable minds can differ on the question before the jury, we will not disturb the jury's verdict. Id.

We review the trial court's denial of a motion for new trial for "abuse of discretion," which occurs when the trial court's ruling is "clearly against the logic of the circumstances before the court at the time and is so unreasonable and arbitrary that is shocks one's sense of justice and indicates a lack of careful consideration." Id. We will reverse the trial court's decision only if we find a substantial or glaring injustice. Id.

### Disability Discrimination under the MHRA

In Point I, Mercy argues the trial court erred in denying his motions for directed verdict and judgment notwithstanding the verdict because Bowolak failed to make a submissible disability discrimination case under the MHRA. Specifically, Mercy argues that Bowolak failed to show he was disabled under the MHRA, that he was discharged, or that he was discharged as a result of his disability. We disagree.

A claim of disability discrimination under Section 213.111, RSMo 2000,[4] of the MHRA requires the plaintiff to show that: 1) he is legally disabled; 2) he was discharged; and 3) the disability was a factor in his discharge. Hervey v. Mo. Dept. of Corrections, 379 S.W.3d 156, 160 (Mo. banc 2012). First, a plaintiff must establish that he is legally disabled. Id. In other words, a plaintiff must establish that he had a disability, or that the defendant regarded him as having a disability, or that he has a record of having a disability. In its first five subpoints, Mercy contends that Bowolak failed to establish either that he had a disability or that Mercy perceived Bowolak to have a disability. Bowolak established that he, in fact, had a disability or was perceived to have an impairment.

A "disability" means: "[A] physical or mental impairment which substantially limits one

---

[4] Unless otherwise indicated, all further statutory references are to RSMo 2000, as amended.

7

or more of a person's major life activities, being regarded as having such an impairment, or a record of having such an impairment, which with or without reasonable accommodation does not interfere with performing the job, utilizing the place of public accommodation, or occupying the dwelling in question." Section 213.010(4).

Mercy alleges that Bowolak's case should be viewed only as a claim of actual impairment, as opposed to being regarded as having an impairment, and/or having a record of an impairment, because Bowolak only pled actual impairment. However, Bowolak's petition states that he was disabled "as defined by Section 213.010(4)," which would include being regarded as having an impairment and having a record of an impairment. More importantly, the evidence at trial was sufficient to allow the jury to find a record of impairment, and/or being regarded as having an impairment and/or actual impairment.[5]

First, there was sufficient evidence to allow the jury to find that Bowolak had a record of impairment in connection with the severe back injury that he sustained in 2002 while working for Cardinal Scale that resulted in a back fusion. Bowolak filed a worker's compensation claim in connection with the 2002 injury, and a settlement was reached reflecting 32 percent permanent partial disability to Bowolak's low back; the jury was aware of this settlement. There was also sufficient evidence to allow the jury to find that Bowolak had an actual impairment relating to the 2002 back injury and resulting back fusion, as is reflected in the 32 percent disability. Bowolak also admitted at trial and during his physical examination for employment with Mercy that his back was never the same and that he was on pain medications. Finally, there was sufficient evidence to allow the jury to find that Bowolak was being regarded as having an impairment by Mercy. Specifically, the discharge letter of March 9, 2011, indicates that Bowolak

_____

[5] We agree with Bowolak that contrary to Mercy's position, these are not inconsistent and/or mutually exclusive conditions.

8

had permanent restrictions, and that Bowolak was "not able to perform the essential functions" of his job.

Mercy next alleges that Bowolak failed to establish that he was discharged. This argument is contradicted by the record. Prior to March 2011, Bowolak worked for Mercy as a Care Service Associate and was paid for his work. In March 2011, Bowolak was informed in person and by letter that he could no longer work in his job, and that he no longer was going to be paid. Bowolak was informed that since he was "not able to perform the essential functions of [his] role and there's no accommodation that could be made for these essential functions, [he was] allowed 30 days to pursue a position where [he could] perform the essential functions." Besides this directive, Mercy never offered Bowolak another appropriate position or even gave assistance in finding one. All evidence in the record indicates Bowolak was terminated.

Finally, Mercy alleges that Bowolak failed to present sufficient evidence that his disability, as defined by the MHRA, contributed to the discharge. Again, the record belies Mercy's argument. In the two meetings in March 2011, as well as in the March 9, 2011 discharge letter, it was set out plainly to Bowolak that he was being discharged because of his back injury of 2002. Pursuant to the MHRA, Bowolak was only required to "show that a protected characteristic contributed to the adverse employment decision." Holmes v. Kansas City Mo. Bd. of Police Comm'rs ex rel. Its Members, 364 S.W.3d 615, 627 (Mo. App. W.D. 2012). A "contributing factor" is a factor that "contributed a share in anything or has a part in producing the effect." Holmes, 364 S.W.3d at 627 (quoting Williams, 281 S.W.3d at 867); see also Daugherty v. City of Maryland Heights, 231 S.W.3d 814, 819 (Mo. banc 2007) (the MHRA provision defining discrimination does not require a plaintiff to prove that discrimination was a substantial or determining factor in an employment decision but rather that consideration of age, disability,

9

or other protected characteristics contributed to the unfair treatment).

Viewing the evidence in the light most favorable to the verdict and disregarding contrary evidence, Bowolak made a submissible case on each element needed to prove disability discrimination.  Point I is denied.

<u>Punitive Damages</u>

In Points II, III, and IV, Mercy raises arguments with respect to the issue of punitive damages.  As these points are interrelated, we address them together.  In Point II, Mercy argues the trial court erred in submitting the issue of punitive damages to the jury because there was insufficient evidence that Mercy's conduct was outrageous as a result of evil motive or reckless indifference.  In Point III, Mercy argues the trial court erred in upholding the award of punitive damages because such award was unconstitutionally excessive.  In Point IV, Mercy argues the trial court erred in prohibiting Mercy from presenting any evidence of its "religious ownership."

When reviewing whether a plaintiff has made a submissible case for punitive damages, we review the evidence in the light most favorable to submissibility, while disregarding all adverse evidence inferences.  <u>Williams</u>, 281 S.W.3d at 870.  Section 213.111.2 permits recovery of punitive damages in claims brought under the MHRA; a plaintiff is entitled to punitive damages if he proves by clear and convincing evidence that the defendant's conduct was outrageous because of the defendant's evil motive or reckless indifference to the rights of others."  <u>Gilliland v. Missouri Athletic Club</u>, 273 S.W.3d 516, 520 (Mo. banc 2009).  "[P]roof offered to support an employee's underlying substantive claim and the employee's additional claim for punitive damages need not be mutually exclusive, and often is not."  <u>Williams</u>, 281 S.W.3d at 870-71.  Punitive damages may be proven by circumstantial evidence and there is no requirement of direct evidence of intentional misconduct as most employment discrimination

cases are "inherently fact-based" and necessarily rely on inferences rather than direct evidence. Holmes, 364 S.W.3d at 628-629. "[P]unitive damages awards are evaluated on a case-by-case basis and '[a]n evil intent may ... be implied from reckless disregard of another's rights and interests.'" Id. at 628.

Here, Bowolak worked for Mercy, without restrictions, from October 2004 until his discharge on March 9, 2011. The record indicates that throughout that time, Bowolak was able to perform the essential functions of his job. The record further indicates that Bowolak passed Mercy's physical examination, performed by Mercy staff, on October 13, 2004, and was accepted into his job with "no restrictions." After Bowolak's injury on January 7, 2010, Mercy's own doctor released Bowolak back to full duty, without restrictions.

The sole basis for discharging Bowolak was the "DRAFT" document, which Mercy claims set forth permanent restrictions. However, the letter was unsigned and over seven years old. At trial, Bowolak presented a letter from Dr. Gocio's office that was not marked "DRAFT" and was signed by Dr. Gocio. The letter indicated that Bowolak was doing well and that Dr. Gocio anticipated releasing Bowolak back to his employment at Cardinal Scale in four weeks. Mercy never called Dr. Gocio to testify as a witness.

Bowolak also presented a report dated January 14, 2004, authored by Dr. Daniel Kitchens (Dr. Kitchens), a neurosurgeon, which was part of the document from the work injury Bowolak sustained in 2002. Dr. Kitchens concluded in his report that Bowolak could return to "heavy work," including returning to Cardinal Scale "without restrictions."

Here, the record indicates that Mercy performed a physical examination of Bowolak in October 2004, with knowledge of Bowolak's prior back injury, the prior back fusion, and Bowolak's current pain medications. Despite knowledge of all these facts, Mercy still accepted

11

Bowolak into his job with "no restrictions." After Bowolak's January 2010 incident, Mercy's own doctor, Dr. Godar, who treated Bowolak, was in possession of the "DRAFT" document dated December 10, 2003, and was aware of Bowolak's job requirements, released Bowolak back to full duty "without restrictions." Under these facts, the jury could have concluded that Mercy acted outrageously towards Bowolak. Viewing the evidence and all reasonable inferences in the light most favorable to submissibility, the evidence presented was sufficient, as a matter of law, to submit the claim for punitive damages to the jury. Holmes, 364 S.W.3d at 628. We find that Bowolak proved by clear and convincing evidence that Mercy's conduct was outrageous and carried out with evil motive or reckless indifference to Bowolak's rights. Point II is denied.

With respect to Point III, the trial court's award of punitive damages was not unconstitutionally excessive.
Section 510.265 provides that: "No award of punitive damages against any defendant shall exceed the greater of: (1) Five hundred thousand dollars; or (2) Five times the net amount of the judgment awarded to the plaintiff against the defendant." Section 510.265.1. Our review of the trial court's determination regarding constitutionality of the punitive award is *de novo*, deferring to the trial court's findings of fact, unless they are clearly erroneous. Peel v. Credit Acceptance Corp., 408 S.W.3d 191, 211 (Mo. App. W.D. 2013). There is no precise constitutional line or simple mathematical formula with regard to determining whether a punitive damages award is grossly excessive; instead, the imposition of punitive damages requires a proper balance be struck between the need for punishment to deter future misconduct and the severity of the award. Peel, 408 S.W.3d at 211. Accordingly, courts reviewing an award of punitive damages consider three factors in determining whether a punitive damages award is grossly excessive: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the

12

plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. Id. at 212 (citing Estate of Overbey v. Chad Franklin Nat'l Auto Sales N., LLC, 361 S.W.3d 364, 372 (Mo. banc 2012)).

Here, Bowolak was awarded $50,000.00 in compensatory damages and $81,500.00 in attorneys' fees and $500,001.00 in punitive damages. Mercy's actions in terminating Bowolak were reprehensible and outrageous. The evidence at trial indicated that Bowolak had been a good employee who performed his job well for over six years. On March 9, 2011, he was brought into a meeting and was terminated; he was no longer paid, and he was not offered any alternative position by Mercy. The use of a seven-year-old document as a basis for termination of a good employee was at a minimum reckless misconduct by Mercy. Based on our standard of review and research of comparable cases, we conclude that the jury's award of punitive damages was not clearly erroneous or constitutionally excessive in this case. See Peel, 408 S.W.3d at 213-14 (Mo. App. W.D. 2013) (the court approved a punitive damage award of $881,789.05, with actual damages totaling $176,357.81; see also Overbey, 361 S.W.3d at 373 (the court approved a punitive damage award of $500,000.00 where the actual damages were $4,500.00); see also The Fireworks Restoration Co., LLC v. Hosto, 371 S.W.3d 83, 1-93 (Mo. App. E.D. 2012) (the court approved an award of $150,000.00 in punitive damages, where the actual damages were $1.00); see also Heckadon v. CFS Enterprises, Inc., 400 S.W.3d 372, 383-86 (Mo. App. W.D. 2013) (the court approved punitive damages totaling $500,000.00, where the actual damages were $2,144.87). Point III is denied.

With respect to Point IV, the trial court did not err in prohibiting evidence of Mercy's "religious ownership" and non-profit status.

13

A trial court has considerable discretion in deciding whether to admit or exclude evidence. Williams, 281 S.W.3d at 872. We defer to the trial court's evidentiary rulings and will reverse only if the court clearly abused its discretion. Id. Upon finding an abuse of discretion, this court will reverse only if the prejudice resulting from the improper admission or exclusion of evidence is outcome-determinative. Id.

Here, Mercy's counsel presented evidence at trial and argued in closing argument, and during the second phase of the trial, relating to the assessment of punitive damages, both about Mercy's religious affiliation and non-profit status. Additionally, Mercy was not prevented from presenting evidence relating to "charitable giving and community activities." We find no abuse of discretion or resulting prejudice. Point IV is denied.

Jury Instructions

In Point V, Mercy argues the trial court erred in accepting Bowolak's proffered instructions because the resulting instructions created a "roving commission" and confused the jury as to his definition of disability and discharge. We disagree.

Whether a jury was instructed properly is a question of law this court reviews *de novo*. Hervey v. Missouri Dept. of Corrections, 379 S.W.3d 156, 159 (Mo. banc 2012). "Review is conducted in the light most favorable to the record, and, if the instruction is supported by any theory, then its submission is proper." Hervey, 379 S.W.3d at 159. "Instructional errors are reversed only if the error resulted in prejudice that materially affects the merits of the action." Id. It is the burden of the party challenging the instruction to show that the offending instruction "misdirected, misled, or confused the jury" and resulted in prejudice to the party challenging the instruction. Id.

Here, Bowolak's Instruction No. 6 was based on MAI 38.01 (2007 Revision), the verdict

14

directing instruction for MHRA cases which was in effect at the time of trial.  Instruction No. 6

read as follows:

> INSTRUCTION NO. 6
> Your verdict must be for plaintiff if you believe:
> First, defendant discharged plaintiff, and
> Second, at the time of discharge plaintiff suffered a disability as defined in
>     Instruction No. 8, and
> Third, disability was a contributing factor in such discharge, and
> Fourth, as a direct result of such conduct, plaintiff sustained damage.

At the time of trial, MAI 38.01[6] needed to be modified in order for the jury to find the disputed

fact of Bowolak's status as legally disabled; however, the caselaw did not set forth the language

of the needed modification.  Hervey, 379 S.W.3d at 163.[7]  As a result, the trial court modified

MAI 38.01 by adding, "Second, at the time of discharge plaintiff suffered from a disability as

defined in Instruction No. 8."

Instruction No. 8 read as follows:

> INSTRUCTION NO. 8
> "Disability" as used in these instructions means a physical or mental
> impairment which substantially limits one or more of a person's major life
> activities, being regarded as having such an impairment, or a record of having
> such an impairment, which with or without reasonable accommodation does not
> interfere with performing the job.

---

[6]  Subsequent to the trial of this case, and in light of the ruling in Hervey, the Missouri Supreme Court formulated MAI 38.01(b), which integrates the definition of disability set forth in Section 213.010(4) in disability discrimination cases pursuant to the MHRA wherein the defendant is contesting legal disability.

[7]  In Hervey, the Missouri Supreme Court held that a similarly-worded verdict director did not instruct the jury adequately about the substantive law in a MHRA case because it assumed as true a disputed fact:  that the plaintiff was disabled.  Hervey, 379 S.W.3d at 163.  As such, the Court reasoned, plaintiff was relieved of her burden of proving an essential element of her disability discrimination claim under the MHRA:  whether the plaintiff was legally disabled at the time of her discharge.  Id.  The Court held that the verdict-directing instruction must require the jury to find that plaintiff was disabled under a separately enumerated paragraph.  Id.  The Court concluded that the submission of a verdict director that did not hypothesize all essential elements of plaintiff's claim was "prejudicial error and require[ed] that the trial court's judgment be reversed and the cause be remanded."  Id.

15

This definition of disability is taken directly from Section 213.010(4) of the MHRA, which defines disability as follows: "'Disability', a physical or mental impairment which substantially limits one or more of a person's major life activities, being regarded as having such an impairment, or a record of having such an impairment, which with or without reasonable accommodation does not interfere with performing the job, … " Section 213.010 (4).

Finally, Mercy argues that the trial court erred in failing to instruct the jury on constructive discharge. Bowolak has never contended that he was constructively discharged, but rather he was terminated from his job. Additionally, the evidence at trial supported Bowolak's contention that he was terminated in March 2011.

In conclusion, the trial court did not err in giving Instruction No. 6 and Instruction No. 8 to the jury. Bowolak pled and presented sufficient evidence for a jury to find that he was disabled as defined by the MHRA, which included a record of impairment, having an actual impairment, and/or being regarded as having such an impairment. Moreover, the evidence was overwhelming that any impairment Bowolak may have had did not interfere with the performance of his job. Point V is denied.

Attorneys' Fees

In Point VI, Mercy argues the trial court erred in awarding Bowolak excessive attorneys' fees given his failure to prevail on all his claims and the lack of evidence presented before the trial court to support such an award. We disagree.

"The determination of reasonable attorneys' fees is in the sound discretion of the trial court and shall not be reversed unless the amount awarded is arbitrarily arrived at or is so unreasonable as to indicate indifference and a lack of proper judicial consideration." Brady v. Curators of University of Missouri, 213 S.W.3d 101, 114 (Mo. App. E.D. 2006). "The trial court is

16

considered an expert on the issue of attorneys' fees such that, in the absence of a contrary showing, the trial court is presumed to know the character of the attorneys' services rendered in duration, zeal and ability." Williams, 281 S.W.3d at 878. Moreover, the MHRA expressly permits the trial court to award to a prevailing party court costs and reasonable attorneys' fees. Id.; Section 213.111.2.

Here, the prevailing party, Bowolak filed his Motion to Amend Judgment to include Award of Attorneys' Fees in the amount of $92,850.00. The motion contained affidavits supporting damages and attorneys' fees; it also contained multiple pages of detailed billing for the services performed by Bowolak's attorneys beginning on March 10, 2011 and ending on May 2, 2013 when the original judgment was entered by the trial court. On July 8, 2013, the trial court amended the judgment and awarded attorneys' fees in the amount of $81,500.00, thereby reducing Bowolak's request by $11,350.00.

While the determination of reasonable attorneys' fees is within the trial court's sound discretion, there are a number of factors that may be considered to determine the amount of attorneys' fees to award, including: 1) the rates customarily charged by the attorneys involved in the case and by other attorneys in the community for similar services; 2) the number of hours reasonably expended on the litigation; 3) the nature and character of the services rendered; 4) the degree of professional ability required; 5) the nature and importance of the subject matter; 6) the amount involved or the result obtained; and 7) the vigor of the opposition. Gilliland, 273 S.W.3d at 523. In Hensley v. Eckerhart, the U.S. Supreme Court stated, "the most critical factor is the degree of success obtained." Hensley v. Eckerhart, 461 U.S. 424, 436, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). A court might also consider the extent to which a plaintiff prevailed on some claims and not on others. Gilliland, 273 S.W.3d at 523-24. If the plaintiff's claims for

17

relief are based on different legal theories and facts, and counsel's work on one claim is unrelated to work on another, then the court should treat the unrelated claims as if they had been raised in separate lawsuits. Alhalabi v. Mo. Dept. of Natural Resources, 300 S.W.3d 518, 530 (Mo. App. E.D. 2009). Therefore, the court may award no fee for services on the unsuccessful and unrelated claims. Alhalabi, 300 S.W.3d at 530. On the other hand, if the claims for relief have a common core of facts and are based on related legal theories, so that much of counsel's time is devoted generally to the litigation as a whole and rendering it difficult to divide the hours expended on a claim-by-claim basis, such a lawsuit cannot be viewed as a series of distinct claims. Id. at 530-31. In short, the efforts of the prevailing attorneys should not be discounted where the effort and proof were the same for the claims on which the plaintiff prevailed and those on which he did not. Gilliland, 273 S.W.3d at 524 (citing Hensley, 461 U.S. at 451, 103 S.Ct. 1933). This is especially true where counsel obtained complete relief for the plaintiff on the successful claims. Id.

Here, in its Amended Judgment, the trial court carefully explained what factors it considered in awarding Bowolak $81,500.00 in attorneys' fees. The trial court stated as follows:

> Following trial, plaintiff, as the prevailing party, filed his request for attorneys' fees in the amount of $92,850.00 (MHRA) Section 213.111.2 RSMo. Both parties filed their memoranda for the Court's consideration. Determination of attorneys' fees is within the sound discretion of the Court. Gilliland v. Mo. Athletic Club, 273 S.W.3d 516, 523 (Mo. banc 2009). In arriving at an amount for plaintiff's reasonable attorneys' fees, the Court has considered the following factors: 1) the reasonableness of plaintiff's attorneys' hourly rates (250.00/150.00); 2) the number of hours expended; 3) the nature and character of the services rendered; 4) the degree of professional ability required; 5) the nature and importance of the subject matter; 6) the amount involved or the result obtained; and 7) the vigor of the opposition. Dewalt v. Davidson Service/Air, Inc., 398 S.W.3d 491, 501 (Mo. App. E.D. 2013). Defendant does not dispute that plaintiff is entitled to attorneys' fees as the prevailing party; it disputes only the amount. The Court finds that a reduction is warranted as the time records were not contemporaneously made,

18

the summary of the time expended on preparation for pleadings and for summary judgment and the like, were in some instances insufficiently specific and excessive in others. The Court finds that plaintiff's counsel was professional, able, and the services rendered were more than adequate. Although the issue of retaliation was not presented to the jury, the Court finds that both claims were sufficiently related and required the same amount of time in preparation. The Court notes that the time records do not include any time spent by plaintiff's counsel on the separate worker's compensation claims. The Court takes note of the vigorous opposition by defendant from the beginning of this case until its conclusion to which plaintiff had to respond. In the final analysis, the most critical factor is the degree of success obtained. Hensley v. Eckerhart, 461 U.S. 424, 436 (1983); Trout v. State, 269 S.W.3d 484, 488 (Mo. App. W.D. 2008). Although defendant argues that plaintiff asked for $62,000.00 and the jury awarded only $50,000.00, this is still a significant verdict. Coupled with punitive damages in the amount of $500,001.00, a reduction in fees is not warranted.

Bowolak obtained a verdict of $550,001.00 and the record shows that the trial court considered all the relevant factors in arriving at its award of attorneys' fees. We find no abuse of discretion. Point VI is denied.

### Redaction of Worker's Compensation Settlement Amount

In Point VII, Mercy's last point on appeal, Mercy argues the trial court erred in redacting the dollar amounts from Bowolak's worker's compensation settlement against his former employer. Mercy contends that the dollar amounts were relevant to its defenses to show the extent of Bowolak's injury and resulted in prejudice against Mercy. We disagree.

A trial court has considerable discretion in deciding whether to admit or exclude evidence. Williams, 281 S.W.3d at 872. We defer to the trial court's evidentiary rulings and will reverse only if the court clearly abused its discretion. Id. It is within the trial court's discretion to weigh the probative value of the evidence against its prejudicial effect. Mitchell v. Kardesch, 313 S.W.3d 667, 674-75 (Mo. banc 2010). If reasonable minds can differ about the propriety of the trial court's action, then it cannot be said that the trial court abused its discretion. Williams, 281 S.W.3d at 872. An abuse of discretion compels reversal only if "the prejudice resulting from

19

the improper admission of evidence is outcome-determinative." Id.

At trial, Mercy entered Exhibit E into evidence that was Bowolak's worker's compensation settlement in connection with his injury of October 2002. The trial court redacted from the settlement the dollar amount while the remaining portions of the settlement were unredacted, including the 32 percent permanent partial disability. Mercy contends that the introduction of the monetary award of Bowolak's settlement would show that Bowolak had "permanent restrictions." Although there is no dispute that Bowolak suffered a serious injury in 2002, nothing in Exhibit E, including the dollar amount, reflects that Bowolak had permanent restrictions. In fact, on the first page of Exhibit E, the settlement reflects a "Return-to-work date" of January 27, 2004.

Here, the jury was aware that Bowolak's 2002 injury resulted in a 32 percent permanent partial disability. There was no probative value to the introduction of the monetary amount, and any potential probative value was far outweighed by the potential prejudice to Bowolak. Mitchell, 313 S.W.3d at 674-75. We find no abuse of discretion. Point VII is denied.

## Post-Judgment Interest

In his cross-appeal, Bowolak argues that the trial court erred in its award of 5 percent post-judgment interest, as opposed to 9 percent, with respect to the award of compensatory and punitive damages. We disagree.

In its Amended Judgment and Order, the trial court found as follows with respect to this issue:

> [Bowolak's] counsel argued that the Judgment should reflect post judgment
> interest accruing at the statutory rate of a non tort action of 9%; [Mercy's] counsel
> argued that as the matter is a tort action, the statutory rate is 5%. The parties
> agree that there is no determinative case law on this issue. The Court finds that
> [Bowolak's] cause of action is more akin to a tort.

20

Under Missouri law, the interest rate for any money due upon any judgment in a non-tort action is set at 9 percent. Section 408.040.2. However, if the judgment is based on a tort action, the interest rate is the Federal Funds Rate plus 5 percent. Id. As the trial court noted, no Missouri decision has specifically determined the proper post-judgment interest rate for a MHRA claim. However, in State ex rel. Diehl v. O'Malley, 95 S.W.3d 82, 87 (Mo. banc 2003), the Missouri Supreme Court analogized a MHRA claim to a tort claim in assessing whether a plaintiff in a MHRA claim has the right to a jury trial:

> The present case—an action for damages for discrimination based upon age, sex and retaliation for filing a discrimination complaint—is analogous to those kinds of actions triable by juries at the time of the Constitution of 1820. Actions for trespass, which included actions for a variety of wrongs to the person, were tried to juries in the courts in 1820. This form of action, now commonly referred to categorically as torts, fits into the analytical framework described in the Briggs case because it was an action for recovery of money only and involved issues of fact, "whether the right or liability is one at common law or is one created by statute."
> An action for damages under the Missouri Human Rights Act seeks redress for an intentional wrong done to a person. It is a modern variant of claims for relief, called forms of action, known to the courts in 1820 for redress of wrongs done to a person.

Diehl, 95 S.W.3d at 87. In Diehl, the Court specifically recognized that "[a]n action for damages under the [MHRA] seeks redress for an intentional wrong done to a person." Id. at 87. As the Missouri Supreme Court has treated discrimination actions as analogous to tort claims, the trial court did not err in awarding post-judgment interest at a 5 percent rate.[8] Point denied.

Conclusion

_____

[8] Although this is an issue of first impression in Missouri, Mercy directs us to one other jurisdiction that has concluded that discrimination actions are akin to torts in the context of post-judgment interest. In Valdez-Zontek v. Eastmont Sch. Dist., 154 Wash. App. 147, 173, 225 P.3d 339, 353 (2010), the court faced the precise issue presented by this case: whether post-judgment interest should be applied at the rate for tort actions, or at the rates for other actions. The court concluded that state law discrimination actions are best viewed as "arising from tortious conduct." Valdez-Zontek at 175; 225 P.3d at 353. Therefore, the court held that the prevailing employee was entitled to post-judgment interest on the award of damages under the rate for tort judgments. Id.

The judgment is affirmed. [9]

_____
Mary K. Hoff, Judge

Sherri B. Sullivan, Presiding Judge, and Philip M. Hess, Judge, concur.

---

[9] Bowolak's motion for attorneys' fees in the amount of $17,625.00, filed on July 7, 2014, is granted.