

# In the Missouri Court of Appeals
# Eastern District

## DIVISION FOUR

ALI AZIZ, BY AND THROUGH HIS ) No. ED101003
NATURAL MOTHER AND NEXT FRIEND, )
ANNETTE BROWN, )
       )
    Respondents, ) Appeal from the Circuit Court
       ) of the City of St. Louis
    vs. ) 1122-CC00629
       )
JACK IN THE BOX, EASTERN DIVISION, ) Honorable Thomas C. Grady
LP, A LIMITED PARTNERSHIP, AND )
JACK IN THE BOX, INC., )
A CORPORATION, )
       )
    Appellants. ) Filed: September 1, 2015

Jack in the Box, Eastern Division, LP, and Jack in the Box, Inc. (collectively

"Defendant")[1] appeals the trial court's denial of its motion for judgment notwithstanding the

verdict following a jury verdict in favor Ali Aziz, by and through his natural mother and next

friend Annette Brown ("Plaintiff") on Plaintiff's claim for premises liability, stemming from an

assault that occurred on Defendant's property.  Defendant also appeals the trial court's denial of

its motion for a new trial for failure to admit impeachment evidence against an expert witness.

We affirm.

---

[1] Jack in the Box, Eastern Division, LP is a wholly owned subsidiary of Jack in the Box, Inc.  We refer to them in the singular as they do in their own brief.

## I.    BACKGROUND

Plaintiff brought a claim for premises liability against Defendant.  A jury trial adduced the following facts, viewed in the light most favorable to the verdict.

Defendant owns and operates a fast food restaurant ("the restaurant") open twenty-four hours a day.  Between the hours of 10:00 p.m. and 6:00 a.m., only the drive-thru window is open, and the dining room is closed.  The restaurant is located near many bars, and as a result attracts many late-night customers.  Diane Malone, one of Defendant's employees, described many customers on weekend nights as "drunks" and "weirdos."

Defendant has an asset protection department that is charged with promoting customer safety and security at its restaurants.  Defendant's internal policies recognize the dangers of loitering and disruptive customers.  The policies on loitering and disruptive activity required that action be taken "immediately" because such activity leads to "fighting," "injury," or other danger to people on the premises.  The policies prohibit walking up to the drive-thru window.  They advise employees to encourage disruptive customers to leave or to call the police.  Despite these policies, Defendant's employees at the restaurant received no formal training on how to deal with disruptive customers.

The restaurant did not have any on-site security guards during the period relevant to this appeal.  Rather, Defendant retained an outside security service, Westec Interactive Security, Inc. ("Westec"), to provide remote assistance.  Defendant's employees had a "duress button" and a "red phone" that allowed them to contact Westec directly in the event of a disruptive situation.  Westec could make an announcement over an outside loudspeaker directing the disruptive customers to leave, or it could call the police.

2

The restaurant had fourteen surveillance cameras inside and outside. A live feed from the cameras was sent to monitors located in the manager's office inside the restaurant. The footage was supposed to be watched by the manager, so that he or she could call Westec or the police in the event of a disturbance.

Sometime before 5:00 a.m. on June 20, 2010, a group of nine young men and women between the ages of seventeen and twenty-three arrived in two cars ("the Lane group"). A white Grand Am, driven by Johnnie Lane, pulled into the drive-thru lane and the second car parked in the parking lot next to the drive-thru lane. The cars played loud music and the five passengers in the parked car exited the car and were dancing and roaming through the parking lot and drive-thru lane. The Lane group walked up to the drive-thru window, held up the drive-thru lane, climbed onto the hood of one person's car, danced on another customer's car, approached numerous other vehicles and customers waiting in and around the drive-thru.

Defendant's employee described it as a "crazy night and very busy" at the restaurant. Customers honked their horns and pulled away because of the disruption by the Lane group. The parties dispute how long the Lane group remained in the parking lot, but one member of the group stated it could have been "thirty minutes, forty minutes, could have been as long as an hour." Despite this lengthy disruption to Defendant's business, Defendant's employees took no action to disperse the Lane group or direct them back to their cars, and no employee contacted Westec. Defendant's employee at the drive-thru window did ask one individual, who was jumping on the hood of another customer's car, to get down, and she complied.

At approximately 5:13 a.m., Plaintiff and his passenger drove into the parking lot. They exited the car and were engaged by several members of the Lane group as they approached the restaurant. Over the next three minutes, additional members of the Lane group walked back and

3

forth between the parking lot and the drive-thru lane, engaging Plaintiff. Lane asked Defendant's drive-thru employee: "Excuse me, ma'am, I have to go break this up," and she replied, "[g]o ahead."

Subsequently a fight broke out, and one of the members of the Lane group knocked Plaintiff to the ground, where he was surrounded by the group. They beat him and kicked him in the head repeatedly. Plaintiff's passenger fled the scene. After the assault, when Plaintiff was lying unconscious and bleeding on the ground, the Lane group robbed Plaintiff and also fled the scene. The attack lasted approximately ninety seconds.

At approximately 5:18 a.m., another customer in the drive-thru lane called 911. The police arrived in response to that call at 5:27 a.m. Defendant's manager did not call the police until 5:26 a.m., after the assault had ended and the police were already on their way. Defendant's drive-thru employee asked the manager to call the police before the Lane group attacked Plaintiff, but he did not do so until she asked him a second time. Defendant's manager admitted he did not take any action the first time the drive-thru employee called out for help and stated that he was not paying attention to the video monitors and was counting money in anticipation of an upcoming shift change. No employee ever pressed the panic button or called Westec to request assistance. No employee called the police when the disruptive activity was causing other customers to leave the premises or at any time during the assault on Plaintiff.

Plaintiff was unresponsive and unable to breathe on his own when he was taken to the emergency room after the attack. He suffered a skull fracture, a fractured jaw, loss of blood, and brain damage. He remained in a coma for approximately two years. Plaintiff spent two months in the hospital after his attack, mostly in intensive care, before moving to a rehab center.

4

Plaintiff's mother, Annette Brown, did not think her son was receiving adequate care at the rehab center, so she quit her job and brought Plaintiff home to live with her. She has cared for him ever since. Plaintiff has anoxic brain damage and many physical limitations. He has severe contraction of his left arm and his legs from being bedridden and comatose, and he is unable to sit, stand, walk, or take care of himself in any way. He takes a number of medications and requires constant care. As of the time of trial, Plaintiff was expected to live another 39.1 years, but his physical condition was not expected to improve.

Dr. Therese Bright, a certified life care planner, opined that Plaintiff will be severely disabled for the remainder of his life and will require 24-hour care, physical therapy, and frequent hospitalizations. Dr. Bright prepared a conservative life care plan to meet Plaintiff's needs, including provision for 24-hour care either at home or in a facility, doctor visits, medications, physical therapy, and hospitalizations. Dr. Bright concluded that the total costs to meet Plaintiff's needs at home would be $493,000 annually, or $19,298,000 over his lifetime. The total lifetime costs to meet his needs at a facility would be $18,242,000.

Dr. Bright is not a medical doctor, and she therefore relied on competency, qualifications, and credentials of the doctors who provided care to Plaintiff to give the basis for the opinions she gave in her life care plan. She provided opinions based on the medical opinions, care, and cost of care billed by one of Plaintiff's treating physicians, Dr. Witt Jamry.

Dr. Jamry did not testify at trial, but rather he submitted testimony via videotape deposition, recorded December 11, 2012. In his deposition, Dr. Jamry stated he reviewed Plaintiff's life care plan prepared by Dr. Bright and agreed with the numbers expressed. Further, when Plaintiff's counsel asked Dr. Jamry if he had health issues forcing him to retire from the practice of medicine, Dr. Jamry responded "Right." Subsequent to Dr. Jamry's deposition, on

5

February 20, 2013, but before trial, an information charging Dr. Jamry with health-care related fraud was filed in federal court. Dr. Jamry pleaded guilty to a single count and was sentenced on July 11, 2013 to one year and one day of imprisonment.

The jury trial ran from August 14, 2013 to August 30, 2013. At trial, Defendant tried to independently introduce the certified record from Dr. Jamry's federal court health care fraud conviction, and Defendant submitted an offer of proof of the conviction, but the trial court denied the request. Ultimately, the jury entered a verdict finding Plaintiff's total damages were $25 million. The verdict assessed Defendant eighty-two percent at fault and Plaintiff eighteen percent at fault, thereby awarding Plaintiff $20.5 million in damages. The trial court entered a judgment in accordance with the jury's verdict, and Defendant subsequently filed a motion for judgment notwithstanding the verdict or for a new trial, which the trial court denied. This appeal followed.

## II.     DISCUSSION

Defendant brings four points on appeal. Points one, two, and three argue the trial court erred in denying Defendant's motion for judgment notwithstanding the verdict, and point four contends the trial court erred in denying Defendant's motion for a new trial.

## A.      Denial of Defendant's motion for judgment notwithstanding the verdict

In its first point, Defendant asserts the trial court erred in denying its motion for judgment notwithstanding the verdict because it did not owe Plaintiff a duty of care to protect him from the criminal acts of third persons under the "special facts and circumstances" exception. In its second point, Defendant contends the trial court erred in denying its motion for judgment notwithstanding the verdict because it did not owe Plaintiff a duty of care because he was not an invitee. In its third point, Defendant argues the trial court erred in denying its motion for

6

judgment notwithstanding the verdict because Plaintiff failed to adduce substantial evidence in support of its verdict-directing instruction.

We review the trial court's denial of a motion for judgment notwithstanding the verdict to determine whether the plaintiff made a submissible case, i.e., whether he "presented substantial evidence for every fact essential to liability." *Davolt v. Highland*, 119 S.W.3d 118, 123 (Mo. App. W.D. 2003) (quotations omitted). Further, "the evidence is viewed in the light most favorable to the result reached by the jury, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict." *Dhyne v. State Farm Fire & Cas. Co.*, 188 S.W.3d 454, 456-57 (Mo. banc 2006). "The jury's verdict will be reversed only if there is a complete absence of probative facts to support the jury's conclusion." *Keveney v. Missouri Military Academy*, 304 S.W.3d 98, 104 (Mo. banc 2010). However, "[d]uty is entirely a question of law, to be determined by reference to the body of statutes, rules, principles and precedents which make up the law; and it must be determined only by the court." *Kopoian v. George W. Miller & Co., Inc.*, 901 S.W.2d 63, 68 (Mo. App. W.D. 1995) (quotations omitted).

## 1.     The special facts and circumstances exception

In its first point, Defendant argues the trial court erred in denying its motion for judgment notwithstanding the verdict because Defendant did not owe Plaintiff a duty of care to protect him from the criminal acts of third persons under the "special facts and circumstances" exception. Specifically, Defendant contends the facts demonstrate it did not have time to prevent Plaintiff's injuries after becoming aware of the risk posed by the Lane Group. We disagree.

Generally, business owners do not have a duty to protect business invitees from the criminal acts of third parties. *Hudson v. Riverport Performance Arts Centre*, 37 S.W.3d 261,

7

264 (Mo. App. E.D. 2000). However, Missouri law recognizes a duty for business owners may be triggered under the "special facts and circumstances" exception. *Id*. This exception may apply when, *inter alia*,[2] a third party who is known to be violent or behaves in a way indicating danger is on the business owner's premises and a sufficient time exists to prevent the injury to the invitee. *Id*.; *L.A.C. ex rel. D.C. v. Ward Parkway Shopping Center Co., L.P.*, 75 S.W.3d 247, 257 (Mo. banc 2002).

Consolidating prior lower appellate case law, the Missouri Supreme Court first outlined this definition of the special facts and circumstances exception in *Madden v. C & K Barbecue Carryout, Inc.*, 758 S.W.2d 59, 62 (Mo. banc 1988). The Court held "a duty to exercise care may be imposed by common law *under the facts and circumstances of a given case*." *Id*. at 61 (emphasis added). It went on to state:

> [T]he Court recognizes that business owners may be under a duty to protect their invitees from the criminal attacks of unknown third persons depending upon the facts and circumstances of a given case. The touchstone for the creation of a duty is foreseeability. A duty of care arises out of circumstances in which there is a foreseeable likelihood that particular acts or omissions will cause harm or injury.

*Id*. at 62 (citations omitted).

The Western District applied *Madden*'s foreseeability test in *Richardson v. QuikTrip Corp.*, 81 S.W.3d 54 (Mo. App. W.D. 2002) (en banc). In that case, a customer ("the plaintiff") was raped by an unknown assailant in a gas station restroom. *Id*. at 56. The restroom was only accessible from the outside, and originally had locks installed. *Id*. at 57. However, the gas station's employees removed the locks because customers repeatedly walked off with the keys in the past. *Id*. As a result, the plaintiff was not able to lock the restroom door, the assailant

---

[2] The special facts and circumstances exception also may apply where prior specific incidents of violent crime have occurred and there is, as a result, a likelihood a third party will endanger the business owner's invitee. *Wood v. Centermark Properties, Inc.*, 984 S.W.2d 517, 524 (Mo. App. E.D. 1998). Although Plaintiff initially pursued this theory at trial, he did not ultimately request a jury instruction on this portion of the exception. It is undisputed that this portion of the special facts and circumstances exception is not relevant to this appeal.

8

entered the restroom while the plaintiff was in it, and he raped her. *Id*. The Court held the gas station owed the plaintiff a duty of care to protect her from the criminal acts of third parties. *Id*. at 67. It reasoned that, pursuant to *Madden*, a court must evaluate the totality of the circumstances to determine foreseeability, and therefore duty. *Id*. at 59-60. The Court held the totality of the circumstances in that case supported a finding of foreseeability where, *inter alia*, (1) the restroom was only accessible from the outside, out of the view of employees and security cameras; (2) the gas station operated twenty-four hours, making it a greater target for crime; and (3) the gas station's own policies recognized the threat of crime, in that it had installed locks on the restroom in the past (and only removed them out of convenience) and the store prohibited employees from taking out the trash at night. *Id*. at 65-66.

The circumstances were substantially similar here. Like the gas station in *Richardson*, the restaurant in this case was open twenty-four hours, making it a greater target for crime. Similarly, Defendant's own policies recognized the threat of crime and the danger that could arise to its customers resulting from late night disruptive loitering, rendering it foreseeable. Defendant's written policies on loitering and disruptive activity required that action be taken "immediately" because such activity leads to "fighting," "injury," or other danger to people on the premises. To help implement those policies, Defendant retained Westec to electronically monitor the premises and be available for emergency response. "Generally speaking, commercial establishments are well positioned to know the extent of crime on the premises . . . to take measures to thwart it and to distribute the costs associated with providing security." *Id*. at 65 n.14 (quotations omitted). Therefore, just as in *Richardson*, the nature of Defendant's business and its own internal policies demonstrate its awareness that loitering and disruptive

9

behavior can lead to danger for other customers, rendering it foreseeable given the totality of the circumstances.

Furthermore, the circumstances here go beyond those in *Richardson*, because Defendant had actual notice of the potential assailant(s) immediately before the assault. The Lane group was violating the loitering and disruptive guest policies, meaning that Defendant could have encouraged them to leave or called the police before Plaintiff arrived. The Lane group arrived at the drive-thru sometime prior to 5:00 a.m. and one member of the group testified that they could have been on the lot for thirty or forty minutes or even an hour. Defendant admits in its brief the Lane group was "loud and even disruptive." Members of the Lane group were playing loud music, getting in and out of their cars, dancing in the parking lot, walking up to the drive-thru window (which was itself a violation of Defendant's drive-thru policy), leaning on other customers' cars, jumping on the hood of another customer's car, dancing on another customer's car, and invading other customers' personal space. Defendant therefore had actual notice of the specific threat, as opposed to the general threat that was found to be sufficient to trigger a duty in *Richardson*.

Defendant asserts that the attack itself lasted approximately ninety seconds, but it took police some nine minutes to arrive, so Defendant did not have sufficient time to prevent Plaintiff's injuries. This argument must fail. The special facts and circumstances exception only requires that the third party behave in a way indicating danger while on the business owner's premises and that a sufficient time exist to prevent the injury to the invitee.[3] *Hudson*, 37 S.W.3d at 264. Here, the Lane group was on Defendant's property behaving in a way indicating danger according to Defendant's own policies for at least thirty minutes or perhaps as much as an hour before Plaintiff even arrived. When the police were eventually called, they arrived in nine

---

[3] Plaintiff's invitee status is discussed below in Section II.B.2.

10

minutes. Therefore, the duration of the actual fight is irrelevant, because Defendant had notice of the potential danger and sufficient time to react and prevent Plaintiff's injury before the fight even began.

Based on the foregoing, Defendant owed Plaintiff a duty of care to protect him from the criminal acts of third persons under the "special facts and circumstances" exception, based on the totality of the circumstances. Point one is denied.

### 2. Plaintiff's invitee status

In its second point on appeal, Defendant contends the trial court erred in denying its motion for judgment notwithstanding the verdict because Plaintiff was not a business invitee at the time of the attack, and as a result, Defendant did not owe him a duty of care. We disagree.

As previously stated, "[d]uty is entirely a question of law, to be determined by reference to the body of statutes, rules, principles and precedents which make up the law; and it must be determined only by the court." *Kopoian*, 901 S.W.2d at 68 (quotations omitted). A possessor of land owes an invitee a duty of care to prevent injury by known dangers and those that could be revealed by inspection. *Adams v. Badgett*, 114 S.W.3d 432, 438 (Mo. App. E.D. 2003).

An individual entering on property has the status of an invitee when the possessor "invites him with the expectation of a material benefit" or extends an invitation "to the public generally." *Id*. at 437, 437 n.6 (quotations omitted). "Any words or conduct of the possessor which lead or encourage the visitor to believe that his entry is desired may be sufficient for the invitation." *Taylor v. Union Electric Co.*, 826 S.W.2d 57, 59 (Mo. App. E.D. 1992) (quotations and emphasis omitted). Here, Defendant operated a fast-food restaurant open to the public at the time of Plaintiff's arrival. Defendant advertised that the restaurant was open twenty-four hours. The restaurant's lights were on, and it was taking orders and serving food when Plaintiff arrived.

11

Cars were backed up in the drive-thru. Defendant was extending an invitation to the public and prospective customers driving by, like Plaintiff, to enter the premises.

There is no requirement that a plaintiff enter a business and complete a transaction in order to be an invitee. A business has a duty to anticipate a customer might be injured while traversing the parking lot to fulfill his shopping objective. *Hellmann v. Droege's Super Market, Inc.*, 943 S.W.2d 655, 659 (Mo. App. E.D. 1997) (en banc). The Supreme Court equated a "prospective customer" with an "invitee" in *Wilkins v. Allied Stores of Mo.*, 308 S.W.2d 623, 628 (Mo. 1958). Therefore, the fact that Plaintiff did not make it to the restaurant building from the parking lot did not affect his invitee status.

Defendant asserts Plaintiff lost his invitee status by engaging members of the Lane group and instigating the fight, but the cases relied on by Defendant do not support its argument. *See Hogate v. American Golf Corp.*, 97 S.W.3d 44 (Mo. App. E.D. 2002); *Cochran v. Burger King Corp.*, 937 S.W.2d 358 (Mo. App. W.D. 1996). In both of those cases, unlike this one, the plaintiffs were trespassers because they left the public premises of the business to venture into a posted non-public area. *Hogate*, 97 S.W.3d at 48; *Cochran*, 937 S.W.2d at 363-64. In *Hogate*, the plaintiff rode his bicycle without permission from a public park onto a golf course and crashed into a yellow rope strung along the edge of the course to keep the public out. 97 S.W.3d at 48. In *Cochran*, the plaintiff entered the parking lot of a fast food restaurant after it was closed for the night and attempted to climb over a wall surrounding a dumpster enclosure. 937 S.W.2d at 363-64. Neither of those plaintiffs was on the property for the property owner's benefit, and both plaintiffs were injured in areas not open to the public. As such, the circumstances in *Hogate* and *Cochran* are distinguishable from those in this case.

12

Under the facts and circumstances here, Plaintiff was an invitee of Defendant's at the time of the attack in that he was on Defendant's property as a potential customer, and therefore, Defendant owed Plaintiff a duty of care. Point two is denied.

### 3.    Defendant's verdict-directing instruction

In its third point on appeal, Defendant argues the trial court erred in denying its motion for judgment notwithstanding the verdict because Plaintiff failed to adduce substantial evidence in support of its verdict-directing instruction. Specifically, Defendant asserts Plaintiff failed to adduce substantial evidence to support submission of the case to the jury because the verdict-directing instruction addressed danger specifically in terms of danger to Plaintiff, rather than danger to customers generally. While in substance Defendant appears to be alleging instructional error, it has framed its point on appeal as an issue of submissibility. We disagree in either case.

Plaintiff's verdict director stated:

In your verdict you must assess a percentage of fault to the Defendant[], whether or not you believe Plaintiff was partly at fault, if you believe:

First, individuals were present on Defendant['s] parking lot who posed a danger to Plaintiff; and

Second, that Defendant[] knew or could have known of the danger posed to Plaintiff; and

Third, either:

Defendant[] failed to notify the authorities when the risk of danger to Plaintiff became apparent; or

Defendant[] failed to remove the individuals when the risk of danger to Plaintiff became apparent; and

Fourth, sufficient time existed within which to prevent injury to Plaintiff; and

Fifth, Defendant[ was] thereby negligent; and

13

Sixth, such negligence of Defendant[] directly caused or directly contributed to cause damage to Plaintiff.

Paragraphs two and three refer to "danger posed to Plaintiff" and "danger to Plaintiff." Consequently, Defendant argues that even if it had notice of the potential danger posed by the Lane group while the group was being disruptive for thirty to sixty minutes, it did not have notice of the danger to Plaintiff specifically, because he was only on Defendant's property for a short time. We reject this hypertechnical reading of the verdict director which Defendant presents without the support of any legal authority. *See Samuels v. Klimowicz*, 380 S.W.2d 418, 421 (Mo. 1964) ("in considering the language of any instruction, we should not be hypercritical but rather should be concerned primarily with its meaning to a jury of ordinarily intelligent laymen") (quotations omitted). The jury instructions stated that "[w]ords or phrases which are not otherwise defined [] as part of these instructions should be given their ordinary meaning." "Plaintiff" was not a defined term. An ordinary reading of the verdict director would interpret "Plaintiff" to refer not to Plaintiff alone but to a person in Plaintiff's position, i.e., a potential customer of Defendant on the premises on the night in question. Viewing the evidence in the light most favorable to the jury's verdict and giving Plaintiff the benefit of all reasonable inferences, the Lane group posed a danger to anyone in Plaintiff's position on the night of the attack.

To the extent that Defendant's argument may be characterized as asserting a lack of substantial evidence of each required element to support submission of Plaintiff's premises liability claim, it also must fail. At trial, Plaintiff needed to produce evidence, (1) that Defendant had a duty to protect Plaintiff from injury; (2) that Defendant breached that duty; and (3) that this failure proximately caused injury to Plaintiff. *L.A.C.*, 75 S.W.3d at 257. As discussed above,

14

Plaintiff demonstrated his entitlement to the "special facts and circumstances" exception, thus establishing as a matter of law that Defendant owed him a duty of care. Whether Defendant's conduct breached the duty of care to Plaintiff is a question of fact. *G.E.T. ex rel. T.T. v. Barron*, 4 S.W.3d 622, 625 (Mo. App. E.D. 1999). Similarly, whether that breach was the proximate cause of Defendant's injury is also an issue of fact. *Peterson v. Summit Fitness, Inc.*, 920 S.W.2d 928, 936 (Mo. App. W.D. 1996). In this case, the jury found Defendant's conduct breached its duty to Plaintiff, and the breach proximately caused his injuries. There was substantial evidence to support the jury's findings that Defendant's conduct breached its duty to Plaintiff, and the breach proximately caused his injuries. Namely, Plaintiff presented evidence of breach by showing that Defendant could have taken steps to disperse the Lane group, but failed to do so, and Plaintiff presented medical testimony demonstrating proximate cause. Again, viewing the evidence in the light most favorable to the jury's verdict and giving Plaintiff the benefit of all reasonable inferences, the evidence presented at trial demonstrates Defendant had time and opportunity to prevent Plaintiff's injury. Point three is denied.

### 4. Conclusion as to Defendant's motion for judgment notwithstanding the verdict

Based on the foregoing, the trial court did not err in denying Defendant's motion for judgment notwithstanding the verdict.

## B. Denial of Defendant's motion for a new trial

In its fourth and final point on appeal, Defendant asserts the trial court erred in denying its motion for a new trial after refusing to permit Defendant to impeach Dr. Jamry's testimony with evidence of his health care fraud conviction. Specifically, Defendant argues it was entitled to introduce evidence of Dr. Jamry's conviction pursuant to section 491.050 RSMo 2000.[4] This

---

[4] All further references to section 491.050 are to RSMo 2000.

15

section provides, in relevant part, "[a]ny person who has been convicted of a crime is, notwithstanding, a competent witness; however, any prior criminal convictions may be proved to affect his credibility in a civil or criminal case . . .." *Id.* (emphasis added). Defendant also asserts Plaintiff "opened the door" by asking Dr. Jamry the reason for his retirement.

Denial of a motion for a new trial is reviewed for abuse of discretion. *Palmer v. Union Pacific R. Co.*, 311 S.W.3d 843, 851 (Mo. App. E.D. 2010). Similarly, we give great deference to the trial court's rulings on evidence and will not overturn them absent an abuse of discretion. *Calzaretta v. Willard*, 391 S.W.3d 488, 491 (Mo. App. S.D. 2013). A trial court abuses its discretion where its ruling shocks the sense of justice, shows a lack of consideration, and is against the logic of the circumstances. *Palmer*, 311 S.W.3d at 854.

We will not reverse a judgment based upon the exclusion of evidence unless a defendant demonstrates that the error resulted in prejudice that would have materially affected the merits of the case. *Bowolak v. Mercy East Communities*, 452 S.W.3d 688, 699 (Mo. App. E.D. 2014); *Lay v. P & G Health Care, Inc.*, 37 S.W.3d 310, 328 (Mo. App. W.D. 2000). Under section 491.050, a trial court commits reversible error if it excludes evidence of a prior criminal conviction where the parties present contradictory testimony on a material fact, putting witness credibility at issue. *Moe v. Blue Springs Truck Lines, Inc.*, 426 S.W.2d 1, 3 (Mo. 1968).

Defendant cannot demonstrate it suffered this type of prejudice. Even assuming *arguendo* the trial court should have admitted the evidence of Dr. Jamry's fraud conviction under either theory asserted by Defendant, any purported error is not reversible because the evidence would not have materially affected the merits of the case. Dr. Jamry testified on Plaintiff's injuries and his diagnosis served as the basis for Dr. Bright's damage calculations. Defendant did not offer any evidence to rebut the material facts in Dr. Jamry's testimony. Defendant did

16

not call its own medical expert or life care planner at trial. In addition, Defendant did not have Plaintiff examined by its own physician, as it had a right to do. Because Defendant did not present any contrary evidence, Defendant cannot show that exclusion of Dr. Jamry's conviction prejudiced it by materially affecting the outcome of the trial or the damage award. Therefore, the trial court did not abuse its discretion in denying Defendant's motion for a new trial. Point four is denied.

## III. CONCLUSION

The trial court's denial of Defendant's motion for judgment notwithstanding the verdict and for a new trial is affirmed.

_____
ROBERT M. CLAYTON III, Judge

Patricia L. Cohen, P.J., and
Roy L. Richter, J. concur.

17