

# Missouri Court of Appeals
## Southern District

### In Division

STEVEN HARNER,              )
)
        Plaintiff-Respondent,    )
)
v.                         )     No. SD37266
)     Filed: **March 7, 2023**
MERCY HOSPITAL JOPLIN,    )
)
        Defendant-Appellant.   )

### APPEAL FROM THE CIRCUIT COURT OF NEWTON COUNTY

Honorable John LePage

**AFFIRMED**

Mercy Hospital Joplin ("Mercy") appeals the trial court's judgment after a jury verdict

for Steven Harner ("Harner") on Harner's single claim of negligence alleging Mercy breached its

duty to protect him from the criminal acts of a third person on Mercy property.

Mercy presents three points on appeal. In Point I, Mercy asserts the trial court erred in

denying Mercy's motion for judgment notwithstanding the verdict ("JNOV") because Harner

failed to make a submissible case on his negligence claim under the Known Third Person

exception.[1] In Points II and III, Mercy asserts the trial court erred in submitting Instruction 8,

---

[1] The parties refer to the two exceptions as the Known Third Person exception and the Unknown Third Person exception, and this opinion will do the same for ease of reference. The parties do not dispute that the Unknown

the verdict director for Harner's negligence claim, because Instruction 8 misstated the law and held Mercy to a higher standard of care than required by law.

Because Harner made a submissible case on his negligence claim under the Known Third Person exception and no instructional error occurred, the judgment is affirmed.

## Procedural History

Harner sued Mercy in negligence relating to injuries Harner sustained in December 2015 when he was shot by Kaylea Liska ("Liska") in Mercy's parking lot while visiting his daughter at Mercy's Emergency Department. Mercy moved for summary judgment, arguing it owed no duty to protect Harner from the criminal acts of a third party. The trial court denied summary judgment. The case was tried to a jury over five days beginning July 19, 2021. Mercy moved for directed verdict at the close of Harner's case and at the close of all of the evidence, and the trial court denied both motions. On July 23, 2021, the jury returned a verdict for Harner and awarded damages of $2,000,000, which the trial court reduced to $1,500,000 based on the jury assessing Harner 25% of the fault. On July 27, 2021, the trial court entered Judgment in accord with the jury verdict. Mercy moved for JNOV, and alternatively, a new trial, which the trial court denied after Mercy and Harner submitted briefing and the trial court heard argument. Mercy timely appealed.

## Point I

In Point I, Mercy asserts the trial court erred in denying Mercy's motion for JNOV because Harner presented "insufficient evidence Mercy knew or had reason to know that [Liska] was violent or posed a danger to [Harner]."

Third Person exception is not at issue because Harner submitted his negligence claim to the jury only under the Known Third Person exception.

<u>Standard of Review</u>

"This Court must determine whether the plaintiff presented a submissible case by offering evidence to support every element necessary for liability." ***Brock v. Dunne***, 637 S.W.3d 22, 26 (Mo. banc 2021) (quoting ***Robinson v. Langenbach***, 599 S.W.3d 167, 176 (Mo. banc 2020)). "A case is submissible when each element essential to liability is supported by legal and substantial evidence." ***Id.*** (quoting ***Johnson v. Auto Handling Corp.***, 523 S.W.3d 452, 459-60 (Mo. banc 2017)). "Substantial evidence is evidence that 'has probative force upon the issues, and from which the trier of fact can reasonably decide the case.'" ***Id.*** (quoting ***Kenney v. Wal-Mart Stores, Inc.***, 100 S.W.3d 809, 814 (Mo. banc 2003)). "Whether the plaintiff made a submissible case is a question of law that this Court reviews *de novo.*" ***Id.*** (quoting ***Newsome v. Kansas City, Mo. Sch. Dist.***, 520 S.W.3d 769, 775 (Mo. banc 2017)). "In determining whether a claim is submissible, this Court views the evidence and all reasonable inferences therefrom in the light most favorable to the jury's verdict." ***Rhoden v. Mo. Delta Med. Ctr.***, 621 S.W.3d 469, 477 (Mo. banc 2021) (citing ***Laughlin v. Perry***, 604 S.W.3d 621, 625 (Mo. banc 2020)). "Any adverse evidence and inferences are disregarded." ***Id.*** (citing ***Darks v. Jackson Cnty***. 601 S.W.3d 247, 259 (Mo.App. 2020)). "Only evidence that tends to support the submission should be considered." ***Id.*** (quoting ***Blanks v. Fluor Corp.***, 450 S.W.3d 308, 401 (Mo.App. 2014)). "However, the Court will not 'supply missing evidence or give [Harner] the benefit of unreasonable, speculative or forced inferences.'" ***Brock***, 637 S.W.3d at 27 (quoting ***State v. Lehman***, 617 S.W.3d 843, 847 (Mo. banc 2021)).

<u>Facts</u>

The evidence with all reasonable inferences in the light most favorable to Harner, as required by our standard of review, is as follows: Keith ("Keith") and Elnora ("Elnora")

Wooldridge, an elderly husband and wife, entered Mercy Parking Lot H on December 23, 2015 in their white Ford Focus (the "Focus"). They spent about five hours in the Mercy Emergency Department and returned when it was dark to the Focus, which did not lock, to find a woman [Liska] inside. Keith told Liska, "Lady, I think you're in the wrong car." Liska exited the Focus on the driver's side without speaking to Keith and ran around the back of the Focus where she nearly ran into Elnora, who was standing by the passenger side of the Focus. The Wooldridges saw Liska take from the Focus a carrying case containing Elnora's prescription medications. Liska urinated and defecated in the Focus and ate peanut butter crackers that Elnora stored in the Focus due to Elnora's diabetic condition. Liska stayed in the Focus at least 20 minutes. Liska testified she saw bottles of prescription medication in the Focus and took them, intending to sell them.

Keith and Elnora immediately went back inside the Mercy Emergency Department and reported to Mercy employee Dee-Dee Baker ("Baker") at the Mercy Emergency Department front desk: "[T]hat we had been robbed. That somebody was in our car and we had been robbed."

Mercy completed a Case Report related to the Wooldridge report. The Case Report identifies the incident type as "Theft/Larceny: From a Person[,]" identifies the Focus, lists the location of the incident as Mercy Parking Lot H, and lists what was stolen as prescription medicines. The Case Report states:

> Dee-Dee, ER Registrations, called and reported two vehicles have been robbed in the ED parking lot. Officer 14 is making contact with Dee-Dee. Dispatch was asked to review camera footage, I was trying to find video footage of individual around a vehicle in the parking lot, when the call came in of a shooting. Officer 14 has information.

The Case Report has a section titled "Narrative text," which states:

4

On 12/23/2015 at 2033 hours, I [O]fficer Meier #14 was dispatched to the ER waiting area to speak with a distraught couple. As we made the introductions, they were quick to inform me that they had been the victims of a theft just prior to them calling security. They provided me with their contact information, a description of the vehicle, a brief description of the suspect, and a short synopsis of what they believed transpired. They were headed out to their vehicle at approx. 2030 hours. When they got to the car, Keith opened up the driver's side door and found the suspect (a woman of petite build, approximately 5'2" tall, with longer than shoulder length dark hair[]) laying down over the seats, rummaging through the glove compartment. As soon as the door opened, the female jumped up, grabbed the box of prescription medicine in the back seat, and exited the car at a high rate of speed. Both Keith and Elnora stated that they hardly had time to react and have no idea which way the thief headed. When asked if the suspect had broken in to the vehicle, they stated that the doors did not lock. I wrote down as much as I could get and then headed off to do mobile rounds.

Baker called Mercy employee Jody Berry ("Dispatcher Berry"), who worked in dispatch for Mercy's Security Department ("Mercy Security"). The Wooldridges testified Mercy Security came right away. Keith testified the Mercy Security guard remarked "they had been looking for her" and "they'd been trying to catch her." The Mercy Security guard told Keith and Elnora that Mercy had been "[l]ooking for a person that was getting into the cars." Keith and Mercy Security guard Officer Ryan Meier ("Officer Meier") went to the Focus while Elnora stayed inside the Mercy facility. Officer Meier viewed the interior and exterior of the Focus. Officer Meier testified he did not talk to any potential witnesses in Mercy Parking Lot H and did nothing else to make sure the person who had been in the Wooldridge vehicle was not still on Mercy property.

Mercy Security told the Joplin Police Department about the Wooldridge report. A Joplin police officer was at Mercy to investigate the Wooldridge report at the time of the Harner shooting.

Mercy Security guard Officer Justin Larcombe ("Officer Larcombe") conducted two rounds by vehicle of Mercy Parking Lot H looking for suspicious people breaking into vehicles

5

after being advised of the Wooldridge report. After the last round, he stopped at the Focus to view the Focus and discuss the Wooldridge report with Officer Meier and Keith. Officer Larcombe testified he had been called upon to serve as an escort for Mercy patients or visitors "many times" during his employment as a Mercy guard. Officer Larcombe testified he had been notified by Mercy Security dispatch in the past of vehicle alarms going off in Mercy parking lots and had investigated those reports and had checked on the vehicles on those occasions and likewise had checked on vehicles in the past in Mercy lots when he himself had heard or seen vehicle alarms going off. Officer Meier testified that, although Officer Larcombe had to carry a flashlight as part of his duties, neither Officer Meier nor Officer Larcombe walked Mercy Parking Lot H to look in each vehicle to find someone entering vehicles. Officer Meier agreed there were fewer than 45 vehicles in Mercy Parking Lot H at the time of the Wooldridge report.

Tim Wampler, Mercy's Manager of Security in December 2015, who was not present on December 23, 2015, testified Officer Larcombe should have gotten out of his security vehicle and conducted a ground search of Mercy Parking Lot H. Thomas Smith, Mercy's retained expert, testified it would have taken one person seven to eight minutes to search Mercy Parking Lot H car-by-car in an effort to find Liska.

After leaving the Focus, Liska approached Flloyd Bennett ("Bennett") in his vehicle and requested a ride. Bennett declined, as he had declined an earlier request by Liska for a ride. Bennett did not report either request for a ride to Mercy.

Liska then entered Harner's vehicle, where she remained for about 50 minutes. Harner had arrived at Mercy at about 5:30 p.m. on December 23, 2015 in his vehicle, a used 2007 Jaguar convertible (the "Jaguar") and parked in Mercy Parking Lot H in what Harner viewed as a safe parking spot by a light pole and next to an empty parking space. Harner was at Mercy to see his

6

daughter, who was receiving treatment at Mercy's Emergency Department. Signage at the Mercy Emergency Department entrance indicated weapons were not allowed inside Mercy.

Harner testified he had a concealed carry permit and owned a Ruger LCP .380 ("the gun"), which he carried with him for safety on nightly walks and stored in the glovebox or center console of the Jaguar. Harner testified the gun was small, fit in a pocket, had no safety, and was chambered and loaded for an emergency but also had a hard pull so it would not fire if stored in a pocket or dropped. In his First Amended Petition, Harner alleged he left the gun in the Jaguar before going inside Mercy to comply with Missouri statute:

> That Missouri Revised Statutes section 571.107.1(17), applicable to Missouri-issued concealed carry permits, explicitly prohibits removal of a firearm from a vehicle when on the premises of "any hospital accessible by the public." That pursuant to Missouri Revised Statutes section 571.107.1(17), [Harner] left his Ruger LCP 380 pistol in his vehicle when he went into Mercy Hospital Joplin to visit his family member.

Harner could not recall if he left the gun in the Jaguar center console or glovebox before entering Mercy. Harner testified both the Jaguar center console and glovebox were unlocked but that he had used his key fob to activate the Jaguar car alarm before entering Mercy. Harner testified that, from the time he had bought the Jaguar in 2012, the Jaguar key fob would activate the Jaguar's alarm and lock the passenger door but not the driver's door. If the driver's door was opened while the alarm was activated, the car's lights would flash continuously and the car's horn would sound continuously for about one minute.

When Liska entered the Jaguar, Liska set off the Jaguar's alarm, causing the Jaguar's lights to flash and horn to honk for fifty-five seconds to one minute. About four minutes later, Liska set off the alarm again, causing the Jaguar's lights to flash and horn to honk for about twelve seconds. Harner set off the Jaguar's alarm when he returned to the Jaguar, moments before he was shot by Liska. Liska shot Harner in the neck at approximately 9:18 p.m. The

7

bullet injured Harner's carotid artery and struck his spine, but he survived. After shooting Harner, Liska tried to enter a silver truck parked next to the Jaguar but could not do so. She then entered a black truck parked next to the silver truck before exiting that truck and fleeing Mercy Parking Lot H. Law enforcement later apprehended Liska. Liska pleaded guilty to shooting Harner and was sentenced to twenty years in prison.

The evidence, consistent with the Case Report, was that Officer Meier instructed Dispatcher Berry to review surveillance video of Mercy Parking Lot H before Liska shot Harner. Dispatcher Berry did not review the surveillance video because she felt she did not have time to do so given her other job duties. Dispatcher Berry did not report to Officer Meier or anyone else at Mercy she did not feel she had time to review the surveillance video. There were no entries on Mercy's internal ReportExec system indicating any additional calls or dispatches between the Wooldridge report and the Harner shooting. Dispatcher Berry testified she had just pulled up the surveillance video and started to zoom in when she received notice of the Harner shooting. Dispatcher Berry testified that, before the Harner shooting, she made no attempt to review the video footage to see if she could see someone getting into vehicles in Mercy Parking Lot H. Dispatcher Berry testified she changed the Case Report after receiving notice of the Harner shooting and before closing out the Case Report to add "I was trying to find video footage" and that she used "poor wording" in light of what she actually did. Dispatcher Berry agreed she "never at any time before [Harner] got shot made any attempt to rewind and go back in time to try to find the person who had gotten into the Wooldridges' vehicle."

Gary Pulsipher ("Pulsipher"), President of Mercy Hospital Joplin at the time of the Harner shooting, testified Dispatcher Berry lied when she prepared the Case Report with the language about reviewing the video without having reviewed the video. Pulsipher agreed putting

false information in a security report relied upon by others is a serious matter. Pulsipher testified if Dispatcher Berry was asked to review the surveillance video and did not have time, it was his expectation she would let somebody know.

Dispatcher Berry agreed the surveillance video shows Liska exit the Focus, approach Bennett, and enter the Jaguar, and that the video also shows the Jaguar's headlights flash two different times when the Jaguar's alarm was set off twice. Dispatcher Berry testified that she might have had time to see these events in the video in the about 40 minutes before the Harner shooting had she viewed the video when instructed to do so by Officer Meier. Berry agreed Mercy's security system is a state-of-the-art system with multiple cameras, including at least one focused on Mercy Parking Lot H, and that the surveillance video system allows real-time viewing and rewind and fast-forward by the minute or hour or set to a specific time, multiple speeds of review up to 100 speed, and zooming in on areas or objects on screen. The evidence was that Mercy was destroyed by a tornado in 2011 and was rebuilt and opened in March 2015.

The jury viewed the Mercy Parking Lot H surveillance video, and it was admitted into evidence as Exhibit 107. Dispatcher Berry testified she reviewed the video footage after the Harner shooting and saw 14 white vehicles in Mercy Parking Lot H, including the Focus owned by the Wooldridges. Dispatcher Berry also testified:

> Q.    And if you would have rewound and reviewed the video and you noticed [Liska] doing what [Liska] did, you would have contacted an officer and said, hey, please check out this black vehicle up here. It looks like somebody just got out of this white car, wandered around the parking lot and made her way into this car. Check it out, please. You would have done that, wouldn't you, if you would have known?
> A.    In all fairness, sir, yes.

Harner offered evidence of multiple Mercy Safety & Security Department Policies and Procedures in effect when he was shot and argued Mercy violated those policies after it knew of

9

the Wooldridge report. The video footage showed no mobile patrols of Mercy Parking Lot H occurred from when Liska entered the lot until three minutes after Liska entered the Jaguar, and Officer Meier testified this violated Mercy Security written policy.

Analysis

"This court is constitutionally bound to follow the most recent controlling decision of the Missouri Supreme Court." *YAM Cap. III, LLC v. GS Hosp., LLC*, 648 S.W.3d 878, 890 (Mo.App. 2022) (quoting *Kinder v. Mo. Dep't of Corr.*, 43 S.W.3d 369, 374 (Mo.App. 2001) (citing Mo. Const. art. V, section 2 (1945)). "In any action for negligence, a plaintiff must establish the defendant owed a duty of care to the plaintiff, the defendant breached that duty, and the defendant's breach proximately caused the plaintiff's injury." *Wieland v. Owner-Operator Servs., Inc.*, 540 S.W.3d 845, 848 (Mo. banc 2018) (citing *L.A.C. ex rel. D.C. v. Ward Parkway Shopping Ctr. Co., L.P.*, 75 S.W.3d 247, 257 (Mo. banc 2002)). "The touchstone for the creation of a duty is foreseeability." *Id.* "A duty to protect against the criminal acts of third parties is generally not recognized because such activities are rarely foreseeable." *Id.* at 848 (quoting *L.A.C.*, 75 S.W.3d at 257). "However, this Court has recognized 'two 'special facts and circumstances' exceptions to the rule that businesses generally have no duty to protect invitees from criminal acts of third persons.'" *Id.* In *Wieland*, the Supreme Court of Missouri explained the Known Third Person exception:

> In recognizing the two exceptions to the "no duty" rule, this Court essentially adopted the rule established by § 344, comment f, of the Restatement (Second) of Torts. *See Madden v. C & K Barbecue Carryout, Inc.*, 758 S.W.2d 59, 62 (Mo. banc 1988). That rule provides:
>
> > *Duty to police premises.* Since the possessor is not an insurer of the visitor's safety, **he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur.** [. . .]

10

Restatement (Second) of Torts § 344 cmt. f (emphasis added).

As further explained:

> The [rule] underscores two rather different situations in which the duty may arise. **The first is when the defendant knows, or has reason to know, that a third party is harming or is about to harm an entrant**. At this point the defendant may be able to protect the entrant only by warning him, summoning the police or utilizing already available security measures. [. . .]

The Law of Premises Liability § 11.03[1], 11-6 (emphasis added) (internal footnotes omitted).

*Id.* at 848-49.

In *Wieland*, the Supreme Court of Missouri also explained:

Accordingly, this Court has explained, "Under the first exception, 'the duty may arise when a person, known to be violent, is present on the premises or an individual is present who has conducted himself so as to indicate danger and sufficient time exists to prevent injury.'" *L.A.C.*, 75 S.W.3d at 257. Because the first exception concerns when a business knows or has reason to know a specific third person is both (1) on its premises and (2) dangerous, no duty of care arises until **after** that specific person has entered the business's premises. *See id.* at 257, 263; Restatement (Second) of Torts § 344 cmt. f and § 12 cmt. a; The Law of Premises Liability § 11.03[1], 11-6.

In contrast, the second exception "recognizes 'a duty [on the part of business owners] to protect their invitees from the criminal attacks of **unknown** third persons' under certain special circumstances." *L.A.C.*, 75 S.W.3d at 257 (emphasis added). Because the second exception concerns when a business knows or has reason to know of dangerous persons in general frequenting its premises, a duty of care arises without regard to any specific person entering the business's premises. *See id.* at 257–58; Restatement (Second) of Torts § 344 cmt. f and § 12 cmt. a; The Law of Premises Liability § 11.03[1], 11-6. In other words, with the second exception, the business is tasked with taking "precautionary actions to protect its business invitees against the criminal activities of unknown third parties." *L.A.C.*, 75 S.W.3d at 258.

*Id.* at 849.

In Point I, the parties do not dispute Harner made a submissible case concerning whether

Mercy knew of Liska's presence in Mercy Parking Lot H before Liska shot Harner and likewise

11

do not dispute that Mercy made a submissible case concerning whether Mercy had sufficient time to prevent Harner's injury after receiving the Wooldridge report.[2] The only issue on review is whether Harner made a submissible case of negligence that Mercy knew or had reason to know that Liska "conducted [herself] so as to indicate danger" before Liska shot Harner. *Id.*

Mercy asserts that the Wooldridge report did not cause Mercy to know or have reason to know that Liska was "dangerous" because Liska "never threatened the Wooldridges and never displayed a weapon or otherwise behaved in any way to indicate that she would later shoot anyone[,]" and "[b]efore [Liska] shot [Harner], all Mercy knew about [Liska] was that she had been in a car without the permission of the owners, had stolen a box of prescription medication, and, when confronted, ran past the elderly couple who owned that car without yelling, threatening them, or showing a weapon." According to Mercy, "while [Liska] may have committed a crime before the shooting, Mercy had no reason to know that [Liska] was violent or posed a danger to anyone on Mercy's property before she shot [Harner]."

We hold Mercy's knowledge of Liska's earlier criminal acts is enough in this specific case to give rise to a duty under the Known Third Person exception where the previous criminal acts are entering one or more vehicles on hospital property and stealing prescription medications from a vehicle, both of which involve highly dangerous and invasive criminal activities.[3] To

---

[2] Mercy argued at trial and its motion for JNOV that it did not have sufficient time to prevent Harner's injury after receiving the Wooldridge report, but Mercy abandoned that argument on appeal. The record evidence was that the Wooldridges made their report to Mercy Security approximately one hour before Liska shot Harner.

[3] Entering an unlocked vehicle, urinating and defecating in the vehicle, and stealing prescription medications from the vehicle could amount to multiple felonies, such as first-degree property damage under Section 569.100, second-degree burglary under Section 569.170, or stealing under Section 570.030. Reviewing the evidence and reasonable inferences in the light most favorable to the verdict, Harner clearly plead "an individual (Liska) was present on defendant Mercy's Parking Lot who posed a danger to plaintiff Steven Harner." Likewise, Instruction 8, the verdict-directing instruction, submitted the issue of whether Liska "posed a danger." Finally, in his brief, Harner also argued Mercy had actual knowledge of Liska's danger: "Liska's initial conduct in unlawfully entering the Wooldridges' vehicle and stealing controlled substances indicated danger. Liska's subsequent entry into [Harner's] vehicle and her continued presence therein further indicated danger." The dissent expresses concern the exception would swallow the rule "if having knowledge of *any* previous criminal act of a Known Third Person is sufficient[.]"

12

find otherwise would add requirements to the Known Third Person exception not found in past Supreme Court of Missouri opinions. Specifically, the Supreme Court of Missouri has never held that, to make a submissible case of negligence under the Known Third Person exception, a plaintiff must prove a verbal altercation, a physical altercation, or display or use of a weapon.[4] Rather, a plaintiff must show "**that a third party is harming or is about to harm an entrant**" or, phrased differently, "when a person, known to be violent, is present on the premises *or* an individual is present who has conducted himself so as to indicate danger and sufficient time exists to prevent injury." *Id.* at 848, 849 (italics added) (internal quotations omitted). Further,

---

But we do not adopt a bright-line rule that a prior criminal act is necessary or sufficient to establish a duty under the Known Third Person exception. That would be no more appropriate than the dissent's position that the Known Third Person exception is "triggered only if the business knew or should have known that the third person was likely to cause *physical* harm to its invitee." Instead, we follow *Wieland* in recognizing that the Known Third Person exception is a "special facts and circumstances" exception necessarily requiring consideration in each specific case of whether the facts and circumstances show a duty is triggered. *See Wieland*, 540 S.W.3d at 848.

[4] In the context of innkeeper liability for an assault on plaintiff by an unknown male assailant in a ladies' restroom at a hotel in St. Louis, our Supreme Court rejected the argument that no duty arises without a like prior violent crime and reversed the trial court's entry of JNOV in favor of defendant after a $100,000 jury verdict in favor of plaintiff. *Virginia D. v. Madesco Inv. Corp.*, 648 S.W.2d 881 (Mo. banc 1983). "There is no requirement that there be at least one mugging or rape before the innkeeper is obliged to consider the possibility. The duty is one of the appropriate degree of care under the circumstances." *Id.* at 887. The Court also noted that had the hotel observed the assailant enter the women's restroom, "an immediate duty to take action would have arisen." *Id.* The Court cited numerous cases from other jurisdictions finding a duty despite lack of a similar violent crime:

> Nor can it be said that the duty of anticipation extends only to crimes similar in nature and seriousness to those that have occurred in the past. *See Orlando Executive Park, Inc. v. P.D.R.,* 402 So.2d 442 (Fla.Dist.Ct.App.1981), (burglaries sufficient to alert hotel operator to possibility of attack); *Mozlak v. Ettinger,* 25 Ill.App.3d 706, 323 N.E.2d 796 (1975); (attempted break-ins at women's residence indicated possibility of assault); *Jenness v. Sheraton-Cadillac Properties, Inc.,* 48 Mich.App. 723, 211 N.W.2d 106 (1973), (in which hotel employees allowed a prostitute to loiter and she assaulted a guest who refused her solicitations); *Morgan v. Bucks Associates,* 428 F.Supp. 546 (E.D.Pa., 1977), (holding that auto thefts on parking lot should alert owner to danger of assaults, citing Restatement (Second) of Torts § 281, Comment (j) (1965)).

> In *Murphy v. Penn Fruit Co., supra,* 418 A.2d at p. 483, the court held that it was proper to instruct the jury that the defendant need not be aware of the exact type of criminal acts that might take place on the premises. There the evidence showed prior non-violent crimes on the defendant's premises, and the defendant was held liable for an attack with a knife on the parking lot. The instruction was more detailed than our practice would permit, but the principle is appropriate to indicate what the jury may consider.

*Id.* at 888.

13

our Supreme Court has held: "Under the principles of general negligence law, whether a duty exists in a given situation depends upon whether a risk was foreseeable." *Lopez v. Three Rivers Elec. Co-op., Inc.*, 26 S.W.3d 151, 156 (Mo. banc 2000). "Foreseeability" is defined "as the presence of some probability or likelihood of harm sufficiently serious that ordinary persons would take precautions to avoid it." *Id.* (citing *Zuber v. Clarkson Constr. Co.*, 251 S.W.2d 52, 55 (Mo. banc 1952)). "The existence of a mere possibility is insufficient." *Id.* "The test is not the balance of probabilities, but of the existence of some probability of sufficient moment to induce the reasonable mind to take the precautions which would avoid it." *Id.* (quoting *Zuber*, 251 S.W.2d at 55).

Harner made a jury-submissible case under the Known Third Person exception standard articulated by our Supreme Court because he established Mercy knew Liska had harmed the Wooldridges by committing multiple criminal acts in entering their vehicle without permission and stealing Elnora's prescription medication. Likewise, Harner showed that, in engaging in these activities right before her attack on Harner, Liska conducted herself so as to indicate danger. Thus, "[w]hether [Mercy] breached that duty with respect to the particular [incident] in this case is a question of fact for the jury." *Lopez*, 26 S.W.3d at 157. Viewing all evidence and reasonable inferences in the light most favorable to the verdict, a reasonable juror could find that Harner offered evidence to support every element necessary for liability. Specifically, Harner offered evidence that Mercy knew Liska was present on Mercy's property and posed a danger to Harner by virtue of the Wooldridge report of Liska's criminal activities of entering a vehicle and defecating and urinating in the vehicle and stealing prescription medications therefrom; that Mercy had sufficient time to act to prevent Harner's injury; and that Mercy was negligent in one or more of the respects submitted in Instruction 8.

14

Mercy asserts it had "no duty . . . to preemptively discover the facts in question . . . a duty of care arises only after the business has information from which a reasonable actor would infer those facts[,]" quoting *Wieland*, 540 S.W.3d at 849. Mercy argues "whether Mercy could have discovered that [Liska] was in [Harner's] car or posed a danger by reviewing the security footage or other means is irrelevant to the Known Third Person analysis."

But, in arguing it had no duty to act after receiving the Wooldridge report, Mercy misconstrues *Wieland*.[5] The issue in *Wieland* was whether a duty arose **before** the assailant entered the premises. In *Wieland*, plaintiff employee's theory of the case was that her defendant employer could have and should have taken any number of actions to protect her or warn her before her ex-boyfriend assailant entered the employee parking lot of her place of employment and shot her. 540 S.W.3d at 847. In *Wieland*, the Supreme Court, in affirming a jury verdict for plaintiff employee, noted, "In making her case to the jury, Wieland primarily argued Owner-Operator failed to take reasonable precautions **before** Lovelace entered the employee parking lot that could have led to the discovery of Lovelace when he entered the parking lot." *Id.* "Because the first exception concerns when a business knows or has reason to know a specific third person is both (1) on its premises and (2) dangerous, no duty of care arises until **after** that specific person has entered the business's premises." *Id.* at 849 (citing *L.A.C.*, 75 S.W.3d at 257, 263; Restatement (Second) of Torts § 344 cmt. f and § 12 cmt. a; The Law of Premises Liability § 11.03[1], 11-6). Likewise, the Law of Premises Liability, in discussing the Known Third Person exception, states, "At this point [after the duty arises, '**when the defendant knows, or has reason to know, that a third party is harming or is about to harm an entrant**[,]'] the

---

[5] Mercy's duty arose when it had actual knowledge of the Wooldridge report of Liska's activities on Mercy property. Then, the issue became one for the jury of whether Mercy breached the duty by its response to its knowledge of the Wooldridge report, including in allegedly failing to review the surveillance video. Thus, review or lack of review of the video in this case goes to breach, not whether a duty was triggered.

15

defendant may be able to protect the entrant only by warning him, summoning the police or utilizing already available security measures." ***Id.*** at 848-49 (citing The Law of Premises Liability § 11.03[1], 11-6) (internal footnotes omitted).

Harner's argument was that once Mercy received the Wooldridge report, Mercy's duty was triggered and Mercy needed to act, including through Dispatcher Berry following Officer Meier's directive to review the surveillance video. This theory is consistent with the Known Third Person exception discussion in ***Wieland***, as there was no argument that Mercy could have or should have acted **before** Liska entered Mercy Parking Lot H.[6] ***Wieland*** does not stand for the proposition that Mercy had no duty to act **after** it had actual notice of the Wooldridge report. Instead, once its duty was triggered, Mercy had to take steps to protect Harner "by warning him, summoning the police or utilizing already available security measures." ***Id.***

Mercy also argues it was not foreseeable that Liska would enter the Jaguar without a locking driver's side door and then shoot Harner with Harner's own gun kept loaded and unsecured in the Jaguar. But this argument ignores the evidence that Mercy had signage at its Emergency Department entrance indicating weapons were prohibited in the facility and ignores Harner's First Amended Petition allegations:

> That Missouri Revised Statutes section 571.107.1(17), applicable to Missouri-issued concealed carry permits, explicitly prohibits removal of a firearm from a vehicle when on the premises of "any hospital accessible by the public." That pursuant to Missouri Revised Statutes section 571.107.1(17), [Harner] left his Ruger LCP 380 pistol in his vehicle when he went into Mercy Hospital Joplin to visit his family member.

---

[6] Mercy's counsel acknowledged at oral argument that this case is factually dissimilar from ***Wieland*** in that Harner did not base his negligence claim on any action Mercy took or failed to take **before** Liska entered Mercy Parking Lot H, whereas plaintiff employee's theory of the case in ***Wieland*** was that her defendant employer could have and should have taken any number of actions to protect or warn her before her ex-boyfriend assailant entered the employee parking lot of her place of employment and shot her.

16

It is settled Missouri law that "[p]arties are presumed to know the law and cannot normally avoid an act or deed on the ground that they were ignorant of the law." *County of Boone v. Reynolds*, 549 S.W.3d 24, 30 (Mo.App. 2018) (quoting *Gen. Motors Corp. v. City of Kansas City*, 895 S.W.2d 59, 62 (Mo.App. 1995)). *See also Strosnider v. Replogle*, 502 S.W.3d 756, 760 (Mo.App. 2016) ("[I]ndividuals are presumed to know the law.") (citing *Grace v. Mo. Gaming Comm'n*, 51 S.W.3d 891, 903 (Mo.App. 2001)). Since October 10, 2014, Section 571.107 has provided:

> A concealed carry permit issued pursuant to sections 571.101 to 571.121, a valid concealed carry endorsement issued prior to August 28, 2013, or a concealed carry endorsement or permit issued by another state or political subdivision of another state shall authorize the person in whose name the permit or endorsement is issued to carry concealed firearms on or about his or her person or vehicle throughout the state. No concealed carry permit issued pursuant to sections 571.101 to 571.121, valid concealed carry endorsement issued prior to August 28, 2013, or a concealed carry endorsement or permit issued by another state or political subdivision of another state shall authorize any person to carry concealed firearms into:
>
> . . . .
>
> (17)  Any hospital accessible by the public. Possession of a firearm in a vehicle on the premises of a hospital shall not be a criminal offense so long as the firearm is not removed from the vehicle or brandished while the vehicle is on the premises.

It was foreseeable to Mercy that its business invitees traveling by vehicle might leave loaded firearms in their vehicles to follow Missouri law and specifically to follow Section 571.107.1(17), as Harner alleged in his First Amended Petition.[7] And this is especially true

---

[7] Likewise, we reject any contention that Mercy had no duty under the Known Third Person exception because the Harner shooting was unforeseeable since Liska did not shoot the Wooldridges or anyone else before she shot Harner. Such a contention ignores that the specific injury need not be foreseeable under Missouri law. *See L.A.C.*, 75 S.W.3d at 258 ("Specifically, 'plaintiff need not show that the very injury resulting from defendant's negligence was foreseeable, but merely that a reasonable person could have foreseen that injuries of the type suffered would be likely to occur under the circumstances.'") (quoting *Smith v. Archbishop of St. Louis*, 632 S.W.2d 516, 521 (Mo.App. 1982) (discussing Unknown Third Person exception)).

17

given that Missouri law's castle doctrine extends to vehicles. *See **State v. Straughter***, 643 S.W.3d 317, 322 (Mo. banc 2022) ("The circuit court was required to give the castle doctrine instruction if there was substantial evidence that: (1) Straughter reasonably believed physical force was necessary to defend herself from what she reasonably believed to be the imminent use of unlawful force by Randell; and (2) Randell unlawfully entered the vehicle.") (citing Sections 563.031.1, 563.031.2(2)). Thus, Harner keeping a loaded gun in his vehicle was not unforeseeable to Mercy given Missouri law concerning (1) loaded firearms in vehicles at hospitals, and (2) application of the castle doctrine to vehicles. That the castle doctrine applies to vehicles under Missouri law is further evidence that, under Missouri law, Liska's criminal acts of entering a vehicle and stealing prescription medication therefrom are considered "dangerous" under Missouri law.

The parties direct us to several cases they claim are instructive on the Known Third Person exception. Mercy relies on ***Claybon v. Midwest Petroleum***, 819 S.W.2d 742 (Mo.App. 1991), and Harner relies on ***Aziz by & through Brown v. Jack in the Box, E. Div., LP***, 477 S.W.3d 98 (Mo.App. 2015). In neither ***Aziz*** nor ***Claybon*** did the appellate court direct the trial court to enter a JNOV after a jury verdict, as Mercy requests in Point I. In ***Claybon***, the court affirmed entry of summary judgment for defendant owner-operator of a service station, while in ***Aziz*** the court affirmed a jury verdict for plaintiff restaurant customer.

---

Foreseeability is not a matter of mathematical certainty as no event is entirely foreseeable. As such, the test for proximate cause is not whether a reasonably prudent person would have foreseen the particular injury, but whether, after the occurrences, the injury appears to be the reasonable and probable consequence of the act or omission of the defendant. It is only necessary that the party charged knew or should have known there was an appreciable chance some injury would result.

***Wilmes v. Consumers Oil Co. of Maryville***, 473 S.W.3d 705, 722 (Mo.App. 2015) (internal citation and quotations omitted).

In ***Claybon***, plaintiffs sued for wrongful death when an employment applicant was fatally shot during the robbery of a service station. 819 S.W.2d at 743. Plaintiffs argued the Known Third Person exception applied because the service station owner-operator "knew of the assailant's identity prior to the attack and because service stations are frequent targets of crime." *Id.* at 745. The court found "Plaintiffs' second amended petition did not allege any duty under this theory [the Known Third Person exception]. Even if they had amended their petition to include this allegation, their affidavits did not support it." *Id.* at 746. The court noted the affidavits offered to oppose summary judgment stated the assailants had been in the service station twice the same day before they returned for the third violent confrontation. *Id.* at 745. Per the affidavits, the first two visits were uneventful, save that in the first visit the assailants tried to obtain cash using a credit card of the service station and were unsuccessful as this was against company policy of the service station. *Id.* They returned a second time and bought $11.00 worth of gas. *Id.* One assailant remained at the service station while the other left and returned and paid for the gas. *Id.* The assailants then left and returned to the service station for a third time, when they sat in the parking lot observing the station's office for about twenty minutes before they entered and robbed the station at gunpoint and fatally shot the employment applicant. *Id.* at 745-46.

***Claybon*** differs from this case because ***Claybon*** involved no prior report of criminal activity, let alone the "harm" or "danger" at issue here in Liska entering multiple vehicles, urinating and defecating in a vehicle, and stealing prescription medications from Elnora. ***Claybon*** stands for the proposition that the service station owner-operator had no duty under the Known Third Person exception based on the assailants simply visiting the premises two times prior during the same day, unsuccessfully trying to use a service station credit card to obtain cash

19

back, buying gas as per any other customer, and spending twenty minutes in their vehicle purportedly watching the service station office. Further, any discussion of the Known Third Person exception in *Claybon* is no more than dicta since the court made clear that plaintiffs pleaded no duty under the Known Third Person exception in their second amended petition. *Id.* at 746. Thus, the suggestion that *Claybon* is analogous to this case or justifies a finding that Harner did not make a submissible case is misplaced.

This case is much more analogous to *Aziz*, where the court affirmed a jury verdict for plaintiff. In *Aziz*, the court found defendant had actual notice right before the assault sufficient to make a submissible case under the Known Third Person exception:

> Defendant had actual notice of the potential assailant(s) immediately before the assault. The Lane group was violating the loitering and disruptive guest policies, meaning that Defendant could have encouraged them to leave or called the police before Plaintiff arrived. The Lane group arrived at the drive-thru sometime prior to 5:00 a.m. and one member of the group testified that they could have been on the lot for thirty or forty minutes or even an hour. Defendant admits in its brief the Lane group was "loud and even disruptive." Members of the Lane group were playing loud music, getting in and out of their cars, dancing in the parking lot, walking up to the drive-thru window (which was itself a violation of Defendant's drive-thru policy), leaning on other customers' cars, jumping on the hood of another customer's car, dancing on another customer's car, and invading other customers' personal space. Defendant therefore had actual notice of the specific threat, as opposed to the general threat that was found to be sufficient to trigger a duty in *Richardson.*

*Aziz*, 477 S.W.3d at 105.

Here, the facts are much more egregious than in *Aziz*, where the court held the business owner "had actual notice of the specific threat" based on the "loud and even disruptive" activities of the eventual assailants. *Id.* Harner established Mercy actually knew of multiple criminal acts by Liska before Liska shot Harner, including the invasive and dangerous criminal acts of entering vehicles in the parking lot and stealing prescription medications from a vehicle. Had the Wooldridges not reported Liska's activity, and had Mercy claimed it had no notice of Liska's

20

past acts, this might be a far different case. But, here, the parties do not dispute that Mercy actually knew of the Wooldridge report of Liska's criminal activities before Liska shot Harner. Thus, as in *Aziz*, Mercy's actual notice of the specific threat was sufficient to trigger a duty to act despite the lack of a "criminal attack" or verbal or physical altercation.

*Aziz* is also similar to this case in that part of the evidence presented to the jury was that "Defendant's manager admitted . . . he was not paying attention to the video monitors and was counting money in anticipation of an upcoming shift change." *Id.* at 102. Likewise, here, the jury heard evidence about Dispatcher Berry's failure to follow the directive to review the surveillance video after Mercy Security received the Wooldridge report. The jury heard Dispatcher Berry's testimony and saw for themselves that the surveillance video showed Liska leaving the Focus, wandering the lot and encountering Bennett, and then entering the Jaguar. The video also showed the Jaguar's lights flashing on multiple occasions when the Jaguar's alarm was activated and deactivated by Liska. The jury heard Dispatcher Berry's testimony that she would have asked someone to investigate the Jaguar had she reviewed the surveillance video when instructed to do so and had she seen the events in the video. There is no indication of a similar scenario in *Claybon*. For this reason as well, *Aziz* is more analogous to this case than *Claybon*.

Mercy argues that *Aziz* is inapposite because *Aziz* applied a "totality of the circumstances" analysis used in the Unknown Third Person exception and that a "totality of the circumstances" analysis does not apply here. *Aziz* referenced the "totality of the circumstances" analysis in discussing **Richardson v. QuikTrip Corp.**, 81 S.W.3d 54 (Mo.App. 2002), and **Madden**, both of which applied the Unknown Third Person exception. *Aziz*, 477 S.W.3d at 104-05, 104 n.2. But the court explicitly noted that, while plaintiff had initially pursued the

21

Unknown Third Person exception, plaintiff did not request a jury instruction on this exception and the exception was not relevant to the appeal. *Id.* at 104 n.2. Further, as discussed above, consistent with the Known Third Person exception, *Aziz* analyzed the restaurant's actual notice prior to the attacks by the known third persons in affirming the jury verdict for plaintiff and finding plaintiff made a submissible case under the Known Third Person exception. *See Aziz*, 477 S.W.3d at 105 ("Futhermore, the circumstances here go beyond those in *Richardson*, because Defendant had actual notice of the potential assailant(s) immediately before the assault. . . . Defendant therefore had actual notice of the specific threat, as opposed to the general threat that was found to be sufficient to trigger a duty in *Richardson*."). The same "actual notice" analysis applies in this case. Mercy had actual notice of the potential assailant, Liska, immediately before Liska shot Harner and this "actual notice of the specific threat" was sufficient to trigger a duty giving rise to a jury-submissible case.[8]

---

[8] Harner argues the "totality of circumstances" approach should also apply to the Known Third Person exception but cites no case where the Supreme Court of Missouri has applied that analysis in the Known Third Person exception. It is unnecessary to apply a "totality of the circumstances" analysis because Harner established a submissible case under the Known Third Person exception based on Mercy's actual knowledge of "danger" or "harm" immediately prior to the Harner shooting. *See also L.A.C.*, 75 S.W.3d at 258 (discussing the Unknown Third Person exception):

> [T]his case does not require that we enter the fray concerning whether a "prior similar incidents," "totality of the circumstances" or a "balancing" test be adopted because the evidence set forth by plaintiff would satisfy any of the three. Moreover, it may well be that adoption of any of these approaches is less helpful than simply utilizing traditional tort language as was done in *Madden.* A traditional tort approach recognizes that both duty and breach adapt to the precise situation of the case, and that duty does not imply strict liability or even breach.

As in *L.A.C.*, the finding of duty does not imply strict liability or breach of duty but rather finds that plaintiff created a jury-submissible case of negligence. A defendant may still dispute every element of negligence to the jury, as Mercy did in this case. Mercy also submitted a comparative fault instruction to the jury, Instruction 10, which stated:

> In your verdict, you must assess a percentage of fault to Plaintiff, whether or not you believe Defendant was partly at fault, if you believe:
>
> First, either:
>
> Plaintiff failed to use ordinary care to secure his loaded firearm within his unlocked vehicle; or
> Plaintiff failed to use ordinary care to retreat after observing Kaylea Liska in his vehicle; or
> Plaintiff initiated the confrontation with Kaylea Liska; and

Mercy also relies on ***Hudson v. Riverport Performance Arts Centre***, 37 S.W.3d 261, 265-66 (Mo.App. 2000), where the court affirmed summary judgment for defendants on plaintiffs' claim under the Unknown Third Person exception related to an assault by an unknown third party during a concert. The court also found no duty under the Known Third Person exception where plaintiff testified he and the assailant had a verbal exchange, plaintiff "just assumed it was over[,]" and plaintiff did not feel the need to inform security staff. ***Id.*** Mercy asserts Liska is like the assailant in ***Hudson*** because Liska did not yell at or threaten the Wooldridges and simply walked away when confronted by the elderly couple. ***Hudson*** plainly differs from this case. The concert venue argued it had no actual notice of the unknown assailant before the assailant assaulted plaintiff, and plaintiff testified he did not feel the need to inform security staff. ***Id.*** Here, the Wooldridges immediately reported Liska's criminal acts to Mercy, and the Case Report reflects the Wooldridges were "distraught" when they made their report. Mercy does not dispute it had actual notice of the Wooldridge report or that it had sufficient time from actual notice of the Wooldridge report to prevent the Harner shooting.

For the reasons stated here, Point I is denied. Harner's allegations, along with the evidence at trial and reasonable inferences therefrom viewed in the light most favorable to the verdict, were sufficient to invoke the Known Third Person exception and create a jury-submissible case concerning whether Mercy breached its duty to Harner in its response or lack thereof to the actual notice it had before the Harner shooting.

---

Second, Plaintiff, in any one or more of the respects submitted in Paragraph First, was thereby negligent, and

Third, such negligence of Plaintiff directly caused or directly contributed to cause any damage to Plaintiff.

The jury found Harner 25% at fault under Instruction 10.

23

## Points II and III

In Points II and III, Mercy claims the trial court erred in giving Instruction 8, the verdict-directing instruction.[9]

In Point II, Mercy asserts:

Instruction 8 misstates the law on the Known Third Person exception . . . in that Instruction 8 allowed the jury to find Mercy liable if Mercy knew or had information from which Mercy, "in the exercise of ordinary care, could have known" that [Liska] was in Mercy's parking lot and posed a danger to [Harner], which imposed a higher standard of care on Mercy than that required by the Supreme Court's decision in *Wieland*, which holds that a business is only liable under the Known Third Person exception if the business knows or "has reason to know" the person is on the premises and is violent or dangerous.

In Point III, Mercy asserts:

Instruction 8 misstates the law on the Known Third Person exception . . . in that Instruction 8 allowed the jury to find Mercy liable if Mercy knew or had information from which Mercy, "in the exercise of ordinary care, could have known" that [Liska] was in Mercy's parking lot and posed a danger to [Harner], which deviates from the Missouri Approved Instructions, which equate the phrase "had reason to know," as used in *Wieland* to accurately state the Known Third Person exception, with the phrase "should have known" in a jury instruction.

### Standard of Review

"[W]hether the jury was properly instructed is a question of law that is reviewed *de novo*." ***Chavez v. Cedar Fair, LP***, 450 S.W.3d 291, 294 (Mo. banc 2014) (citing ***Coomer v. Kansas City Royals Baseball Corp.***, 437 S.W.3d 184, 191 (Mo. banc 2014)). "This Court will only vacate a judgment on the basis of an instructional error if that error 'materially affected the merits of the action.'" *Id.* "Accordingly, 'the party challenging the instruction must show that the offending instruction misdirected, misled, or confused the jury, resulting in prejudice to the party challenging the instruction.'" *Id.* (citation omitted). "If a particular MAI does not state the

---

[9] The trial court rejected verdict directors submitted by the parties and submitted its own verdict-directing instruction, Instruction 8.

24

substantive law accurately, it should not be given." ***Hervey v. Mo. Dep't of Corr.***, 379 S.W.3d

156, 159 (Mo. banc 2012).

Analysis

Instruction 8, the verdict director given to the jury, stated:

In your verdict, you must assess a percentage of fault to Defendant, whether or not Plaintiff was partly at fault, if you believe:

First, that Kaylea Liska was present in Defendant's parking lot on December 23, 2015, and posed a danger to Plaintiff, and

Second, that Defendant knew or had information from which Defendant, in the exercise of ordinary care, could have known Kaylea Liska was present in Defendant's parking lot on December 23, 2015, and

Third, that Defendant knew or had information from which Defendant, in the exercise of ordinary care, could have known Kaylea Liska posed a danger to Plaintiff, and

Fourth, that either:

>    Defendant failed to locate Kaylea Liska in Plaintiff's vehicle; or

>    Defendant failed to warn Plaintiff of Kaylea Liska's presence in Defendant's parking lot; or

>    Defendant failed to offer an escort to Plaintiff; and

Fifth, that sufficient time existed within which to prevent injury to Plaintiff, and

Sixth, Defendant, in any one or more of the respects submitted in paragraph Fourth, was thereby negligent, and

Seventh, such negligence directly caused or directly contributed to cause damage to Plaintiff.

The trial court did not err in submitting Instruction 8 because Instruction 8 did not

misstate the law. Instruction 8 is modeled in part after MAI 22.03 -- Invitee Injured [2021

Revision], and Instruction 8 used "could have known" language as in MAI 22.03. But

Instruction 8 also incorporated "knew or had information from which defendant, in the exercise

25

of ordinary care" from MAI 22.01 – Trespassing Children [1996 Revision].  Therefore, Instruction 8 followed neither MAI 22.01 or MAI 22.03 precisely and instead incorporated parts of each.  This is consistent with our Supreme Court's decisions concerning the Known Third Person exception and specifically with the concerns expressed in *Wieland* about the verdict-directing instruction limiting liability to what defendant knew and did or did not do **after** the third party entered the premises.  Instruction 8 generally tracked the verdict-directing instruction given and upheld in *Aziz* in using "could have known" except Instruction 8 also included "or had information from which Mercy, in the exercise of ordinary care[.]"  This language, "or had information from which Mercy, in the exercise of ordinary[,]" tracked MAI 22.01, and this language was specifically requested by Mercy in its proffered verdict director, Instruction 8B.

Contrary to Mercy's argument in Point II, Instruction 8 did not impose a higher standard of care on Mercy than required by *Wieland*.  As Mercy acknowledges, *Wieland* did not decide the verdict-directing instruction to be given for the Known Third Person exception:  "Owner-Operator expressly abandons any challenge to the language of the verdict director, stating in its brief that 'the language of [the verdict director] is not being challenged in this appeal on the basis that it did not properly instruct upon the elements of the [first] exception.'"  *Wieland*, 540 S.W.3d at 851-52.  "Whether the verdict director misstated the substantive law or otherwise misled the jury is a separate and distinct issue not raised by Owner-Operator on appeal."  *Id.* at 852.[10]

---

[10] In *Wieland*, the majority noted that the dissent failed to appreciate that defendant "never proffered a **correct** verdict director itself [because] Owner-Operator's proffered verdict director omitted the 'or had reason to know' language."  540 S.W.3d at 852 n.5.  The same is true here.  Mercy's proffered verdict director did not track MAI 22.03 and likewise did not track MAI 22.01 in that it used "should have known" in both paragraphs Second and Third (instead of "should have known" and "could have known" in MAI 22.01).  Mercy never asked the trial court to submit an instruction using "had reason to know" or proffered an instruction using that language, instead arguing for the first time on appeal that the verdict-directing instruction should have included "had reason to know."  Mercy's proffered instruction also contained "after the risk of danger to Plaintiff became apparent to Defendant" in paragraphs Fourth and Fifth, which is language not found in MAI 22.01 or MAI 22.03.  It is difficult to understand

To the extent Mercy claims in Point II that Instruction 8 misstated the law in **Wieland** based on dicta in **Wieland**, Point II still lacks merit.[11] In **Wieland**, the court stated in dicta: "Notably, the Restatement's rule is phrased in terms of 'knows or has reason to know.' Unlike 'should know' or 'could know,' 'reason to know' creates no duty of care on the part of the business to preemptively discover the facts in question; rather, 'reason to know' means a duty of care arises only after the business has information from which a reasonable actor would infer those facts." **Id.** at 849 (citing Restatement (Second) of Torts § 12 cmt. a; § 344, cmt. f). The court further observed:

> As is discussed in the analysis of Owner-Operator's remaining points, though the verdict director must have been based on the first exception, the language of the verdict director suggests Owner-Operator had a duty of care **before** Lovelace entered the parking lot. Pursuant to the language actually used in the verdict director, the jury could have considered evidence of Owner-Operator's failure to take precautions before Lovelace entered the parking lot.

**Id.** at 851.

As stated in the discussion of Point I, the plaintiff's theory in **Wieland** was that her employer's duty arose **before** her ex-boyfriend entered the employee parking lot. **Id.** at 847. The alleged negligence submitted in **Wieland** was that "defendant failed to use ordinary care to notify law enforcement authorities when the risk of danger to plaintiff became apparent[.]" **Id.** Per the **Wieland** dicta, the instruction did not advise the jury that the defendant only had the duty to notify law enforcement authorities **after** plaintiff's ex-boyfriend entered the premises. **Id.** at 851. In this case, the alleged negligent acts submitted in Instruction 8 all explicitly involved

---

how it should have been clear to the trial court and the parties that Instruction 8 misstated the law in failing to use "had reason to know" when Mercy did not proffer its own alternative instruction with that language.

[11] "We are not bound by dicta from our Supreme Court." **Goodman v. Wampler**, 407 S.W.3d 96, 103 (Mo.App. 2013) (citing **T.Q.L. ex rel. M.M.A. v. L.L.**, 291 S.W.3d 258, 265 (Mo.App. 2009)). "Dicta can be persuasive when it is supported by logic." **Id.** (citing **Swisher v. Swisher**, 124 S.W.3d 477, 482 (Mo.App. 2003)).

conduct post-Liska's presence in Mercy Parking Lot H:  "Mercy failed to locate Liska in Harner's vehicle; or Mercy failed to warn Harner of Liska's presence in Mercy's parking lot; or Mercy failed to offer an escort to Harner."  Further, there is no dispute that Mercy had actual notice of Liska's presence before the Harner shooting through the Wooldridge report to Mercy.  Thus, any dicta discussion in *Wieland* about how the instruction may have permitted the jury to find the defendant liable for negligence for defendant's action or inaction **before** plaintiff's ex-boyfriend entered the premises is irrelevant and inapplicable here.  Point II is denied.

For the same reasons, we deny Mercy's Point III that Instruction 8 misstated the law and deviated from the MAI in not using "should have known" or "had reason to know."  Mercy argues "'had reason to know' is the only correct instruction [but] the next best alternative would have been to use the MAI-equivalent 'should have known.'"  Instruction 8 did not misstate the law in using "could have known" instead of "should have known" or "had reason to know" because nothing in *Wieland* considered or decided this issue, as discussed above in Point II.  Further, neither the trial court nor the parties had any reason to know or think Missouri law requires use of "had reason to know" when not a single MAI uses "has reason to know" or "had reason to know."  Instead, Committee Comment B to MAI 22.01 states:

> Paragraph B Paragraph Second uses the phrase "had information from which defendant, in the exercise of ordinary care, should have known" as the equivalent of the phrase "had reason to know" as defined in Restatement (First) and (Second) of Torts § 12.  The Committee has opted to use this equivalent phrase rather than "had reason to know" because it is thought that the phrase "had reason to know" may be confusing or misleading to the jury.

Mo. Approved Jury Instr. (Civil) 22.01 (8th ed) comm. cmt. B.

Instruction 8 did not misstate the law in omitting "had reason to know" when the MAI itself has rejected use of "had reason to know" as "confusing or misleading to the jury."  Further,

28

Committee Comment C to MAI 22.01 provides as follows about when "should have known" or "could have known" should be used:

> The 1995 Revision to this instruction changed the phrase "should have known" to "could have known" on the issue of constructive notice in Paragraph Third. Some MAI instructions had used one of the phrases and other instructions had used the other phrase. Questions had arisen as to whether "should have known" imposed a higher burden than "could have known". See Benton v. City of Rolla, 872 S.W.2d 882 (Mo.App. S.D. 1994), and Burrell v. Mayfair-Lennox Hotels, Inc., 442 S.W.2d 47 (Mo. 1969). For consistency, the Committee has opted to use the phrase "could have known" to the extent possible in the context of constructive notice. Other instructions, such as MAI 10.07, paragraph Second of MAI 22.01, MAI 22.07, and MAI 25.10(A), continue to use the phrase "should have known" because that phrase is part of a "knew or had reason to know" standard as explained in the Committee Comments to those instructions.

Mo. Approved Jury Instr. (Civil) 22.01 (8th ed) comm. cmt. C.

MAI 22.03 uses "could have known." MAI 22.01 uses both "should have known" and "could have known":

> Second, defendant knew or had information from which defendant, in the exercise of ordinary care, *should have known* that children would be exposed to such condition, and

> Third, defendant knew or by using ordinary care *could have known* such condition presented an unreasonable risk of harm to children exposed to it[.]

Mo. Approved Jury Instr. (Civil) 22.01 (8th ed) (emphasis added).

Based on Committee Comments B and C to MAI 22.01, Instruction 8 did not misstate the law in including "had information from which defendant, in the exercise of ordinary care" in place of "had reason to know" as in MAI 22.01 and in including "could have known" as in MAI 22.03.

Further, Mercy suffered no prejudice from submission of Instruction 8 in that Instruction 8 did not permit the jury to return a verdict for Harner based on what Mercy could have or should have known before Liska entered Mercy Parking Lot H because (1) Instruction 8

29

submitted to the jury the issue of what Mercy actually knew, and (2) Instruction 8 was much more specific than the verdict-directing instruction in *Wieland* and appropriately limited the alleged negligence to Mercy's alleged negligence *after* Liska entered Mercy Parking Lot H.  The concerns expressed by the court in *Wieland* are not present here.  Instruction 8 did not misstate the law as to the Known Third Person exception.  Point III is denied.

## Conclusion

The judgment is affirmed.

GINGER K. GOOCH, J. – OPINION AUTHOR

JENNIFER R. GROWCOCK, J. – CONCURS

DON E. BURRELL, J. – DISSENTS IN SEPARATE OPINION



# Missouri Court of Appeals
## Southern District

### In Division

STEVEN LEE HARNER,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　Plaintiff-Respondent,　　　　　)
　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　)　　　No. SD37266
　　　　　　　　　　　　　　　　　　　)
MERCY HOSPITAL, JOPLIN,　　　　　　 )　　　**Filed:  March 7, 2023**
　　　　　　　　　　　　　　　　　　　)
　　　Defendant-Appellant.　　　　　　)

APPEAL FROM THE CIRCUIT COURT OF NEWTON COUNTY

Honorable John LePage

**DISSENTING OPINION**

I respectfully dissent.  Finding merit in Mercy's first point on appeal, I would reverse the judgment and direct the circuit court to enter a judgment notwithstanding the verdict ("JNOV") in favor of Mercy.  Point 1 claims the circuit court erred in denying Mercy's motion for JNOV because Harner failed to make a submissible case on the Known Third Person exception to the general rule that a premises owner has no duty to protect invitees from the criminal acts of a third party ("the no-duty rule").  I agree.[1]

Specifically, Point 1 claims:

> The [circuit] court erred in denying [Mercy]'s JNOV motion and in submitting a claim for negligence against [Mercy] to the jury under the

---

[1] Because a grant of Point 1 would be dispositive, I do not address Mercy's second and third points.

Known Third Person exception to the general rule against liability for third-party criminal acts because [Harner] failed to make a submissible case for negligence based on the Known Third Person exception in that [Harner] did not present sufficient evidence that [Mercy] owed a duty to protect [Harner] from [Liska] because there was insufficient evidence [Mercy] *knew or had reason to know* that [Liska] was violent or posed a danger to [Harner]. [(Emphasis added).]

We review the circuit court's denial of a motion for JNOV

to determine whether the plaintiff made a submissible case, i.e., whether he "presented substantial evidence for every fact essential to liability." *Davolt v. Highland,* 119 S.W.3d 118, 123 (Mo.App.W.D.2003) (quotations omitted). Further, "the evidence is viewed in the light most favorable to the result reached by the jury, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict." *Dhyne v. State Farm Fire & Cas. Co.,* 188 S.W.3d 454, 456–57 (Mo. banc 2006). "The jury's verdict will be reversed only if there is a complete absence of probative facts to support the jury's conclusion." *Keveney v. Missouri Military Academy,* 304 S.W.3d 98, 104 (Mo. banc 2010).

***Aziz by & through Brown v. Jack in the Box, E. Div., LP***, 477 S.W.3d 98, 103 (Mo.

App. E.D. 2015).

In any action for negligence, a plaintiff must establish the defendant owed a duty of care to the plaintiff, the defendant breached that duty, and the defendant's breach proximately caused the plaintiff's injury. *L.A.C. ex rel. D.C. v. Ward Parkway Shopping Ctr. Co., L.P.*, 75 S.W.3d 247, 257 (Mo. banc 2002). "The touchstone for the creation of a duty is foreseeability." *Id.* (internal quotations omitted). "A duty to protect against the criminal acts of third parties is generally not recognized because such activities are rarely foreseeable." *Id.* However, this Court has recognized "two 'special facts and circumstances' exceptions to the rule that businesses generally have no duty to protect invitees from criminal acts of third persons." *Id.*

***Wieland v. Owner-Operator Servs., Inc.***, 540 S.W.3d 845, 848 (Mo. banc 2018).

In ***Wieland***, our high court discussed as follows the applicability of the Known

Third Person exception:

In recognizing the two exceptions to the "no duty" rule, this Court essentially adopted the rule established by § 344, comment f, of the

2

Restatement (Second) of Torts. *See Madden v. C & K Barbecue Carryout, Inc.*, 758 S.W.2d 59, 62 (Mo. banc 1988). That rule provides:

> *Duty to police premises.* Since the possessor is not an insurer of the visitor's safety, **he is ordinarily under no duty to exercise any care until he knows or has reason to know that the *acts* of the third person are occurring, or are about to occur.** [. . .]

Restatement (Second) of Torts § 344 cmt. f (emphasis added).

> As further explained:

> The [rule] underscores two rather different situations in which the duty may arise. **The first is when the defendant knows, or has reason to know, that a third party is *harming* or is about to *harm* an entrant**. At this point the defendant may be able to protect the entrant only by warning him, summoning the police or utilizing already available security measures. [. . .]

The Law of Premises Liability § 11.03[1], 11-6 (emphasis added) (internal footnotes omitted).[2]

> Notably, the Restatement's rule is phrased in terms of "knows or has reason to know." Restatement (Second) of Torts § 344, cmt. f. Unlike "should know" or "could know," *"reason to know" creates no duty of care on the part of the business to preemptively discover the facts in question*; rather, "reason to know" means a duty of care arises only after the business *has* information from which a reasonable actor would infer those facts. *See* Restatement (Second) of Torts § 12 cmt. a.

540 S.W.3d at 848-49 (emphasis added). *See also Aziz*, 477 S.W.3d at 103-04.

"The element of duty in a negligence claim is a question of law for the circuit court to determine before a plaintiff can go to trial on the claim." ***Reddick v. Spring Lake Ests. Homeowner's Ass'n***, 648 S.W.3d 765, 774 (Mo. App. E.D. 2022). Courts

---

[2] The principal opinion does an excellent job of laying out the case for affirming the judgment. I believe that our disagreement boils down to what prior criminal "acts" and "harms" committed by a third party make it foreseeable by the business owner that the third party "is *likely* to endanger the safety of a visitor." ***Richardson v. QuikTrip Corp.***, 81 S.W.3d 54, 59 (Mo. App. W.D. 2002) (en banc) (quoting ***Becker v. Diamond Parking, Inc.***, 768 S.W.2d 169, 170-71 (Mo. App. W.D. 1989)).

3

must examine the totality of the circumstances when evaluating foreseeability, and therefore duty. *Aziz*, 477 S.W.3d at 104. The Known Third Person exception "requires that the third party behave in a way indicating danger while on the business owner's premises and that a sufficient time exist [sic] to prevent the injury to the invitee." *Id.* at 105.[3] Said another way, "a duty may arise whenever it is *foreseeable* that conduct of a known or unknown third person is *likely* to endanger the safety of a visitor." *Richardson* 81 S.W.3d at 59 (quoting *Becker*, 768 S.W.2d at 170-71). "[B]usiness owners will be held to have a duty to protect their invitees when the 'facts and circumstances of a given case' establish that a criminal *attack* on the plaintiff was foreseeable." *Id.* at 60 (emphasis added) (quoting *Madden*, 758 S.W.2d at 59).

The principal opinion relies on three "facts" to support its claim that Harner made a submissible case that Mercy had a duty to protect Harner from Liska. (1) Liska had entered the Wooldridges' vehicle; (2) Liska urinated and defecated in the Wooldridge's vehicle;[4] and (3) Liska stole prescription medication from the Wooldridge's vehicle. The majority also claims that Liska engaged in "invasive and dangerous criminal acts[.]" But both vehicles that Liska entered were *unlocked*. Getting into a stranger's automobile without permission to do so is certainly invasive, but opening an unlocked door is significantly less invasive than, for example, smashing a car window to gain entry to a vehicle, and it seems a bit of a stretch to say that entering an unlocked, unoccupied

---

[3] As noted by the principal opinion, Harner does not claim that Mercy knew or should have known that Liska was dangerous based upon acts that she may have committed before entering Mercy's premises.
[4] While such repugnant behavior, in the words of Officer Meier, might "speak to the mental state of the individual" and "seem odd," I question whether this fact would indicate that Liska posed a danger to Harner.

4

vehicle qualifies as the type of "dangerous criminal act[]" contemplated by the Restatement.

In ***Claybon v. Midwest Petroleum Co.***, 819 S.W.2d 742 (Mo. App. E.D. 1991), the Eastern District concluded that the business owners were under no duty to protect the plaintiff from a criminal attack by third parties. Reginald Claybon was shot and killed by two assailants who entered a gas station while Claybon was there applying for a job. ***Id.*** at 744. Claybon's beneficiaries filed suit and alleged that the owners of the gas station owed a duty to protect him from the lethal assault under the "special facts and circumstances" exception because they knew the assailants' identities prior to the attack. ***Id.*** at 745.

The plaintiffs alleged that the two assailants had been in the gas station twice before that day. ***Id.*** On the first occasion, they had attempted to obtain cash using a credit card. On the second occasion, they bought gas. ***Id.*** Neither had money to pay for the gas, so one waited at the station while the other went to retrieve the money necessary to pay for it. ***Id.*** When the assailants returned the third time, they sat in the parking lot for approximately twenty minutes before they entered the station, robbed it at gunpoint, and shot Claybon. ***Id.*** at 745-46.

In ***Claybon***, the Eastern District concluded that those facts were insufficient to state a claim under the Known Third Person exception because the assailants had not acted "in a manner indicating they were about to become violent or dangerous." ***Id.*** at 746. Nothing in the record indicated that, prior to the shooting, the assailants had "displayed firearms or weapons, used loud or threatening language, or otherwise acted in

a physically threatening manner." *Id.* Rather, "the assailants did not conduct themselves in a manner which indicated imminent danger until the holdup began." *Id.*

In a similar manner here, Liska did not act in a dangerous or threatening manner until Harner yelled at her when he found her inside his car. It was undisputed that, prior to her arrival on Mercy's premises at approximately 6:55 p.m. on December 23, 2015, Mercy did not know Liska and did not know of any dangerous propensities that she might have. Prior to her shooting of Harner, Liska did not engage in any verbal or physical altercations on Mercy's premises.

The principal opinion compares this case to *Aziz*, but the rowdy, confrontational group at issue in *Aziz* consisted of *nine* people. In my view, the facts at issue in *Aziz* were significantly more egregious, disruptive, confrontational, and prolonged than what had occurred in the instant case before Harner was shot. *See* 477 S.W.3d at 101-02.

The first time that Mercy knew of Liska's presence on the premises was at about 8:30 p.m., approximately 45 minutes before the shooting. At that time, Officer Meier received a phone call regarding a theft that had taken place in the parking lot. Officer Meier went to meet with the victims, an elderly couple, the Wooldridges, in the hospital's emergency department. The Wooldridges reported that a petite, "five-two" female had stolen prescription medication from their car. They said that their car doors did not lock, and when they found the suspect rummaging through their car's glovebox, she grabbed a box of prescription medication and "exited the car at a high rate of speed." The Wooldridges did not describe the woman as angry, yelling, or threatening. They did not say that she had a weapon or made any physical contact with them.

6

Officer Meier and the Wooldridges then went out to investigate their vehicle. When they returned inside, Officer Meier asked the Wooldridges to wait by the emergency department desk for the Joplin police to arrive. Officer Meier then went to search the premises for the suspect. As he was searching, a call came across his radio that there had been a shooting in the parking lot.

Harner argues that the Known Third Person exception applies in this case because Mercy had actual knowledge of Liska's dangerousness in that Mercy knew that Liska had entered the Wooldridges' car and stolen their prescription medication. By definition, any crime is deemed to be harmful to someone or some thing. But not every crime endangers a *person*. If having knowledge of *any* previous criminal act of a Known Third Person is sufficient to incur liability for the subsequent criminal acts of that third person, the ostensibly "limited" Known Third Person exception carved out from the no-duty rule would effectively swallow that general rule completely.

The standard is "when the defendant knows, or has reason to know, that a third party is harming or is about to harm an entrant." The Law of Premises Liability § 11.03[1], 11-6. In my view, the duty of a business to protect entrants by policing its premises would be triggered only if the business knew or should have known that the third person was likely to cause *physical* harm to its invitee. Here, no evidence adduced at trial indicated that Mercy either knew or had reason to know that Liska had been or was "about to become violent or dangerous." *Claybon*, 819 S.W.2d at 745-46.

Harner also argues that, even if Mercy did not actually know that Liska posed a threat, they *should* have known it and *could* have known it *if* Mercy had reviewed the security footage of the surveillance videos of the parking lot. Once Mercy knew that the

7

Wooldridges had been a victim of a theft, Harner argues, Mercy should have reviewed recorded security-camera surveillance of the parking lot, which *would have* revealed that Liska had entered and remained in Harner's vehicle.

I first note that Mercy was not under a duty to affirmatively discover facts that might demonstrate a danger to invitees. As discussed in ***Wieland***, the Restatement's rule is phrased in terms of "knows or has reason to know." Such a standard "creates no duty of care on the part of the business to preemptively discover the facts in question;" rather, the duty arises "only after the business *has* information from which a reasonable actor would infer those facts." 540 S.W.3d at 848-49 (emphasis added).[5] *See also **Hudson v. Riverport Performing Arts Centre***, 37 S.W.3d 261, 263, 265 (Mo. App. E.D. 2000) (holding no duty to protect a patron from the criminal acts of a third party because no defendant – either the security at the venue or the venue itself – had knowledge that the man was dangerous, and the man had not acted in a way so as to indicate that he was dangerous by getting into a scuffle over a blanket minutes before the assault).

Therefore, as a matter of law, I would hold that Mercy had no duty to protect Harner from Liska's criminal acts on the night in question, reverse the judgment, and direct the circuit court to enter a JNOV in favor of Mercy.

DON E. BURRELL, J. – DISSENTING OPINION AUTHOR

---

[5] Preemptive means "marked by the seizing of the initiative **:** initiated by oneself[,]" https://www.merriam-webster.com/dictionary/preemptive (last visited Mar. 2, 2023).